**UNITED STATES of America**

**v.**

**Michael O. MYERS, Angelo J. Errichetti, Louis C. Johanson and Howard L. Criden, Defendants.**

**UNITED STATES of America**

**v.**

**Raymond F. LEDERER, Angelo J. Errichetti, Louis C. Johanson and Howard L. Criden, Defendants.**

**UNITED STATES of America**

**v.**

**Frank THOMPSON, Jr., John M. Murphy, Howard L. Criden and Joseph Silvestri, Defendants.**

**Nos. CR 80–00249, 80–00253 and 80–00291.**

United States District Court, E. D. New York.

July 24, 1981.

U. S. Atty., U. S. Dept. of Justice, Organized Crime Strike Force by Thomas P. Puccio and Lawrence H. Sharf, Brooklyn, N. Y., for the U. S.

Hundley & Cacheris, P. C. by Plato Cacheris and Larry S. Gondelman, Washington, D. C., Jokelson & Rosen by Neil Jokelson and Rochelle Newman, Philadelphia, Pa., for defendant Michael O. Myers.

Brown, Brown & Furst by Raymond A. Brown and Henry F. Furst, Newark, N. J., for defendant Angelo J. Errichetti.

John J. Duffy, Philadelphia, Pa., for defendant Louis C. Johanson.

Melrod, Redman & Gartlan by Richard Ben-Veniste and Neil I. Levy, Washington, D. C., for defendant Howard L. Criden.

James J. Binns, Bongiovanni & Reagoso, Philadelphia, Pa., for defendant Raymond F. Lederer.

Stephen E. Kaufman, New York City, Arnold & Porter by Daniel A. Rezneck,

Clifford D. Stromberg and Robert N. Weiner, Washington, D. C., for defendant Frank Thompson, Jr.

Tigar, Buffone & Doyle by Michael E. Tigar, Samuel J. Buffone and Linda Huber, Washington, D. C., for defendant John M. Murphy.

## TABLE OF CONTENTS

| | Page |
|---|---|
| I. ABSCAM | 1209 |
| II. THE SUBJECT CASES | 1212 |
| A. U. S. v. Myers, Errichetti, Johanson and Criden. | 1212 |
| B. U. S. v. Lederer. | 1213 |
| C. U. S. v. Thompson and Murphy. | 1213 |
| III. PRETRIAL AND POST-TRIAL PROCEEDINGS | 1214 |
| IV. DEFENDANTS' CLAIMS | 1217 |
| A. Claims of the Myers Defendants. | 1217 |
| B. Thompson's Claims. | 1218 |
| C. Murphy's Claims. | 1218 |
| D. Lederer's Claims. | 1218 |
| E. Claims of the Government. | 1219 |
| V. GENERAL DISCUSSION OF BASIC LEGAL CONCEPTS | 1219 |
| A. Entrapment. | 1219 |
| B. Outrageousness. | 1222 |
| VI. SPECIFIC DISCUSSION OF DEFENDANTS' CLAIMS | 1224 |
| A. General Nature of Abscam. | 1224 |
| 1. Objective Entrapment and Entrapment as a Matter of Law. | 1224 |
| 2. Outrageous Government Conduct. | 1225 |
| 3. Selection of Targets. | 1226 |
| 4. Size of Inducements. | 1227 |
| 5. Need for Investigative Tactic. | 1228 |
| 6. Lack of Reliability. | 1229 |
| B. Specific Operation of Abscam. | 1230 |
| 1. Inadequate Safeguards. | 1230 |
| 2. Missing Tapes. | 1231 |
| 3. Verbal Insulation. | 1231 |
| 4. Violations of Laws, Regulations, and Guidelines. | 1232 |
| 5. "Red Flags". | 1233 |
| 6. Use of Middlemen. | 1235 |
| 7. Book-writing. | 1237 |
| 8. The "Asylum" Scenario. | 1239 |
| C. Weinberg and his Conduct. | 1239 |
| 1. Weinberg's Criminal Background. | 1239 |
| 2. Weinberg's Finances. | 1240 |
| D. Miscellaneous Claims. | 1241 |
| 1. FBI Interview of Lederer. | 1241 |
| 2. Instructing Agents about Testimony. | 1241 |
| 3. Entrapment of Lederer. | 1241 |
| 4. Publicity Leaks. | 1242 |
| VII. JUDGE FULLAM'S DECISION IN U. S. v. JANNOTTI AND SCHWARTZ | 1243 |
| VIII. DEL TUFO, PLAZA AND WEIR | 1245 |
| IX. MOTIONS FOR JUDGMENTS OF ACQUITTAL AND NEW TRIALS | 1247 |
| A. The Myers Motions. | 1247 |
| B. Murphy's Motions. | 1248 |
| C. Thompson's Motion. | 1250 |
| X. CONCLUSION | 1250 |

GEORGE C. PRATT, District Judge:

## I. ABSCAM

"Abscam" is the code word given by the Federal Bureau of Investigation to an undercover "sting" operation conducted out of the FBI office at Hauppauge, Long Island, New York, under the supervision of agent John Good. Abscam began after Melvin Weinberg in 1977 was convicted in the Western District of Pennsylvania on his plea of guilty to fraud. In return for a sentence of probation Weinberg agreed to cooperate with the FBI in setting up an undercover operation similar to the London Investors, Ltd. "business" that Weinberg had used with remarkable success before his arrest and conviction in Pittsburgh.

For most of his life Weinberg had been a "con man" operating in the gray area between legitimate enterprise and crude criminality. For a number of years in the 1960s and early 1970s, he had been listed as an informant by the FBI and had provided his contact agent from time to time with intelligence about various known and suspected criminals and criminal activities in the New York metropolitan area and elsewhere, for which he had received in return occasional small payments of money. When he was arrested on the charge that led to his guilty plea, his informant status was cancelled, later to be reinstated after his guilty plea and agreement to cooperate with the FBI.

As agent-in-charge of the FBI's Long Island office Good was, at all times, the supervising agent for Abscam. Initially, Weinberg worked directly under special agent John McCarthy who later was replaced by special agent Anthony Amoroso. Both McCarthy and Amoroso worked undercover with Weinberg.

The general pattern of the "scam" or "sting" operation reflected Weinberg's earlier theme of representing wealthy Arab interests who had large sums of cash available for business opportunities in this country. When operating outside the law in

Huntington, Long Island as London Investors, Weinberg's method had been a "front-end scam" for real estate investment wherein he would promise to obtain large loans for his victims and pick-up "appraisal" or "processing" fees of several thousand dollars, but without ever producing the final loans.

Although not identical to London Investors, the initial plan developed by Weinberg and the FBI was similar. Weinberg was to present himself as a business agent for "Abdul Enterprises", an organization backed by two extremely wealthy Arab sheiks looking for American outlets for their cash. He would pass the word of big money available for deals to other con men and people who move between the legitimate and illegitimate. If criminal proposals appeared, appropriate action would be taken by the FBI.

Weinberg and the agents set up business in an office in Holbrook, Long Island. The FBI's code name "Abscam" came from the first two letters of "Abdul", combined with the word "scam".

At first Abscam's focus was upon stolen and forged securities and stolen art work. Other "investment" opportunities soon presented themselves, and quickly the investigation turned itself toward Atlantic City and the gambling casinos which were then being proposed and constructed. As word spread about Weinberg's contact with virtually inexhaustible Arab funds, Angelo Errichetti, who was both mayor of Camden, New Jersey, and a New Jersey state senator, came on the scene. Errichetti claimed to have extraordinary influence in obtaining gambling casino licenses, power over the commissioners who issued the licenses, connections with organized crime, ability to deal in narcotics, guns and counterfeit securities, as well as intimate knowledge of which members of the New Jersey legislature could be bought.

Errichetti brought to the undercover agents Howard Criden, a Philadelphia lawyer seeking to promote a gambling casino in Atlantic City. In July of 1979, Errichetti and Criden met with Weinberg and Amoroso on the sheiks' yacht in Florida to discuss financing for the proposed casino that a client of Criden's wanted to build. In the course of the day Amoroso and Errichetti discussed the problem that might be faced by the sheiks should a revolution occur in their country and should they want to come to the United States as permanent residents. Amoroso told Errichetti that he thought cooperation of public officials would be needed and that money would be no problem.

Immediately after this conversation Errichetti and Criden formed an alliance in which they undertook to produce for Amoroso and Weinberg public officials who, in return for money, were willing to use their influence with the government on the sheiks' behalf. Meetings were arranged at various locations in New York, Philadelphia and Washington where the FBI monitored the proceedings with concealed videotape cameras and microphones. Where videotape was not feasible, audio recordings were used.

Cash payoffs were made by the undercover agents to six members of the House of Representatives, one immigration official, Mayor Errichetti, two members of the Philadelphia city council and, allegedly, to a member of the New Jersey Casino Control Commission. In addition to the transactions involving cash payments to public officials, Abscam was stringing along in separate discussions a number of persons, including Senator Harrison A. Williams, Jr. and Congressman John M. Murphy, in connection with promised investments on projects in which each was to hold an interest.

Toward the end of 1979 the credibility of Abdul Enterprises was beginning to wear thin, because the only cash produced were the $50,000 payments to congressmen, relatively small amounts when compared to the large business investments and bank deposits which had been promised by Weinberg and Amoroso. Security for the investigation was increasingly jeopardized as more and more people became aware of Abdul Enterprises and its activities, and the end of

the investigation was clearly in sight by December, 1979. Because much of the revealed political corruption focused on the Philadelphia area, at the request of the U. S. Attorney for the Eastern District of Pennsylvania the investigation was extended for a brief period in order to provide an opportunity for uncovering there additional corruption at the local level.

Saturday, February 2, 1980, was scheduled as the wrap-up day of the investigation, the day on which Abscam was to "go public". A few days before that, some reporters got wind of the investigation and sought information about it, particularly from the U. S. Attorney in Philadelphia and from Thomas Puccio and his staff at the Eastern District Strike Force in Brooklyn. The government representatives managed to keep the publicity lid on until Saturday, February 2, 1980, when teams of FBI agents interviewed, almost simultaneously, many of those whose activities with Weinberg and Amoroso had marked them as either targets or key witnesses in the Abscam investigation.

Abscam's surfacing brought extensive publicity, enhanced, perhaps, by almost simultaneous surfacing of other FBI "sting" operations, "Brilab" and "Pendorf" in the south and west parts of the country, respectively.

As a result of the Abscam investigation, grand juries returned the following indictments:

1. *U. S. v. Alexander Andrew Alexandro, Jr. and Alfred Carpentier*, docket no. CR 80–00102, Eastern District of New York, tried before Hon. Mark A. Costantino in October, 1980.

2. *U. S. v. Michael O. Myers, Angelo J. Errichetti, Louis C. Johanson and Howard L. Criden*, docket no. CR 80–00249, Eastern District of New York, tried before the undersigned in August, 1980.

3. *U. S. v. Raymond F. Lederer, Angelo J. Errichetti, Louis C. Johanson and Howard L. Criden*, docket no. CR 80–00253, Eastern District of New York, tried before the undersigned in January, 1981.[1]

4. *U. S. v. Frank Thompson, Jr., John M. Murphy, Howard L. Criden and Joseph Silvestri*, docket no. CR 80–00291, Eastern District of New York, tried before the undersigned in November, 1980.[2]

5. *U. S. v. Harry P. Jannotti, George X. Schwartz, Howard L. Criden and Louis C. Johanson*, docket no. CR 80–00166, Eastern District of Pennsylvania, tried before Hon. John P. Fullam in September, 1980.[3]

6. *U. S. v. John W. Jenrette and John R. Stowe*, docket no. CR 80–00289, District of Columbia, tried before Hon. John G. Penn in September, 1980.

7. *U. S. v. Richard Kelly, Eugene Robert Ciuzio and Stanley Weisz*, docket no. CR 80–00340, District of Columbia, tried before Hon. William B. Bryant in December, 1980.

8. *U. S. v. Harrison A. Williams, Jr., Alexander Feinberg, George Katz and Angelo J. Errichetti*, docket no. CR 80–00575, Eastern District of New York, tried before the undersigned in April, 1981.[4]

---

1. Only Lederer was tried at that time. By agreement, trial of defendants Errichetti, Johanson and Criden has been deferred pending the outcome of the trial and convictions in *Myers*. The government agreed that if these defendants are convicted and sentenced in *Myers* and if their convictions survive appellate review, then the government will move to dismiss the charges against them in *Lederer.*

2. Only Thompson and Murphy were tried. Criden's trial was deferred by the same agreement described in note 1, *supra*. On the government's unopposed motion, Silvestri's trial was severed. Since then the court has been informed by counsel that Silvestri may be indicted in still another Abscam case, in which event

the government would pursue the new indictment and dismiss EDNY # CR 80–00291 against him.

3. Only Jannotti and Schwartz were tried, Criden and Johanson having been severed because of their earlier conviction in *Myers*. After Judge Fullam's dismissal of the charges against Jannotti and Schwartz, *see* section VII, *infra*, the government moved to dismiss this case as against Criden and Johanson.

4. Only Williams and Feinberg were tried. Errichetti was severed on an agreement similar to that entered into for the *Lederer* case. *See* note 1, *supra*. Katz was severed because his poor health prevented his going to trial when the case was otherwise ready for trial.

9. *U. S. v. Kenneth N. MacDonald and Angelo Errichetti*, docket no. CR 81–00366. Indictment returned June 18, 1981, Eastern District of New York, to be tried before the undersigned in November, 1981.

10. *U. S. v. Charles T. Walsh, Martin Gabey, Vincent J. Cuti, Jr., Nicholas Barbato, Angelo J. Errichetti, and Bowe, Walsh & Associates*, docket no. CR 81–00218. Indictment returned April 9, 1981; superseding indictment returned May 21, 1981, Eastern District of New York, to be tried before the undersigned in September, 1981.[5]

The court is informed that the Abscam grand jury is still sitting in the Eastern District of New York, and that still more indictments are anticipated.

In all cases tried to date, the principal evidence against most of the defendants consisted of the videotapes of their own words and actions. That evidence was supplemented by audiotapes of meetings and telephone conversations, testimony by coconspirators and unrelated third party witnesses, and documents. There was also testimony by FBI agents of interviews with various defendants. In addition, Amoroso and Weinberg testified, but primarily to set the scene and provide a framework for introduction in evidence of the video and audio tapes. Some defendants were severed for trial; all who were tried, were found guilty by the jury on one or more counts.

## II. THE SUBJECT CASES

Before considering and deciding the parties' claims on the instant motions, the court will review in more detail the circumstances of each of the three cases in which post-trial motions are now pending.

### A. *U. S. v. Myers, Errichetti, Johanson and Criden.*

The *Myers* trial involved four defendants. Defendant Michael O. Myers was a member of the United States House of Representatives from Philadelphia. He was brought to the undercover operatives through defendant Angelo J. Errichetti and defendant Howard L. Criden, who made contact with Myers through Criden's law partner, defendant Louis C. Johanson.

Myers was the first congressman to take money in front of the Abscam TV cameras. He did so in a hotel room at Kennedy Airport on August 22, 1979 in the presence of Errichetti, Amoroso and Weinberg; Johanson and Criden had both travelled to Kennedy Airport for the occasion, but were not present when the money was given by Amoroso to Myers. All four defendants shared in the $50,000, with Errichetti receiving $15,000, Myers $15,000 and Johanson and Criden $20,000, part of which they shared with their law partner, Ellis Cook, who testified at the trial as an immunized witness.

The specific charges against the defendants were bribery (18 U.S.C. § 201(c)), criminal gratuity (18 U.S.C. § 201(g)), interstate travel for unlawful activity (18 U.S.C. § 1952), and conspiracy (18 U.S.C. § 371). Myers was charged with direct violations of the first three offenses; the other defendants were charged with aiding and abetting Myers' commission of the offenses. 18 U.S.C. § 2.

Myers testified on his own behalf and attempted to convince the jury that when he appeared on the videotape and received the money in return for his promise to introduce a private bill to enable the sheik to enter and remain in this country, he was only "play acting". He argued that he had no criminal intent under the federal statutes because he never intended ultimately to do the acts for which he was receiving the money. In other words, Myers' defense was essentially that although he was swindling the sheik, in no way was he compro-

---

5. This is not a "pure" Abscam case, because only a relatively small part of it involves the undercover agents. The court has been informed, however, that Abscam played a significant role in revealing alleged corruption in the awarding and administering of contracts for constructing sewer systems in Long Island, New Jersey and Connecticut. Errichetti has been severed on an agreement similar to that entered into in *Lederer* and *Williams*. *See* note 1, *supra*.

mising his congressional office. Resolution of that central fact question rested peculiarly within the jury's province. They had the opportunity to view Myers on the witness stand and to evaluate his conduct and statements before the TV cameras. In fact, the jury asked to review the key videotapes during their deliberations. Ultimately they resolved this credibility issue against Myers.

Under the court's instructions, the jury's verdicts of guilty against all defendants necessarily established the elements of the crimes charged.

On the bribery count, 18 U.S.C. § 201(c), the jury found that Myers received money from Amoroso in return for being influenced in his performance of an official act, and that he acted knowingly, wilfully and corruptly. The central issue presented to the jury was Myers' intent when he took the money. The jury's verdict determined that he took it with a specific intent to be influenced in connection with official matters relating to immigration, and that the other defendants aided and abetted him in his bribery.

Under the court's instructions the jury returned no verdict on the criminal gratuity count, 18 U.S.C. § 201(g), a lesser included offense of the bribery count (§ 201(c)), because they had found all defendants guilty of bribery.

On the interstate travel count, 18 U.S.C. § 1952, the jury found that on August 22, 1979 Myers travelled in interstate commerce from Philadelphia to JFK airport in New York with intent to carry on the unlawful activity of receiving a bribe, that he thereafter performed an act either to carry on or promote the unlawful activity or to distribute its proceeds, and that he acted knowingly and wilfully. Again Errichetti, Criden and Johansen were found guilty as aiders and abetters.

On the conspiracy count, 18 U.S.C. § 371, the jury found that all four defendants conspired to defraud the United States of the faithful and honest service of Congressman Myers and to have him receive money as a bribe in connection with the immigration, residency and citizenship problems of the fictitious middle eastern businessmen.

Once the jury resolved the central credibility issue as to whether Myers was "play acting" before the cameras with no intent to have it affect his official conduct, the evidence against the defendants was overwhelming, and there is no basis to set aside any of the verdicts for insufficiency of evidence.

### B. U. S. v. Lederer.

Trial of the *Lederer* events seemed like a rerun of the *Myers* story. Only the congressman was different. Raymond F. Lederer was also a member of the House of Representatives from Philadelphia. He was also brought to the undercover agents through the activities of Criden, Johanson and Errichetti. He, too, was given $50,000 in front of the TV cameras at a Kennedy Airport hotel in return for his promise to use his office and influence to assist the sheik in his immigration efforts. Lederer received only $5,000 of the total sum, however; the remainder was divided among Criden, Johanson and Errichetti.

The charges against the *Lederer* defendants were bribery (§ 201(c)), criminal gratuity (§ 201(g)), interstate travel for unlawful activity (§ 1952), and conspiracy (§ 371).

Lederer was tried alone. *See* note 1, *supra.* He presented a defense of entrapment which the jury resolved against him. The court instructed the jury that there was ample evidence of inducement and that the key entrapment issue for them to focus upon was whether or not Congressman Lederer was predisposed to commit the crimes charged. The jury's verdicts resolved that issue against Lederer on each count. Those verdicts also establish all the necessary elements of each of the charges beyond a reasonable doubt. Once again, the videotape evidence showing Lederer accepting the money in return for his assurances of action on the sheik's behalf in immigration matters was overwhelming.

### C. U. S. v. Thompson & Murphy.

Frank Thompson, Jr. and John M. Murphy, United States congressmen from Tren-

ton, New Jersey and Staten Island, New York, respectively, were the third and fourth members of the House of Representatives to be indicted in the Eastern District of New York. The facts and charges against them were more complex and subtle than those against Myers and Lederer. Their codefendants, Criden and Joseph Silvestri, were severed. *See* note 2, *supra*.

Although Thompson had received a $50,000 payment from the undercover agents in Washington in connection with his own promise to provide immigration assistance to the sheik, the charges against him under this indictment grew out of a payment made to Congressman Murphy in a hotel near Kennedy Airport. The government's evidence showed that Thompson had approached two other congressmen, John P. Murtha and defendant Murphy, encouraging them to meet with the sheik's representatives in return for "walking around money" that would be shared with Thompson. The *Thompson-Murphy* trial was complicated by an involved transaction wherein Murphy and a business partner sought from the sheik financing for the acquisition of a shipping company in Puerto Rico.

Murtha refused to accept the money, and no indictment was returned against him. The jury found that Murphy did accept the money offered to him, and while the jury found Murphy not guilty of bribery, apparently because they were not satisfied that he had fully committed himself to use his influence on the sheik's behalf, they did find Murphy guilty of receiving a criminal gratuity (§ 201(g)), conflict of interest (§ 203(a)), and conspiracy (§ 371). Pursuant to the court's instructions, the jury did not return a verdict on the interstate travel count (§ 1952) since they found Murphy not guilty on the bribery count.[6]

Thompson was found guilty of bribery (§ 201(c)), criminal gratuity (§ 201(g)), and conspiracy (§ 371). The jury found him not guilty on the conflict of interest charge (§ 203(a)); Thompson was not charged with a travel act violation.

The key transaction in the *Thompson-Murphy* case was the transfer of $50,000 to Murphy in a briefcase on October 20, 1979. Under the court's instructions the jury's verdicts establish that each defendant knowingly received part of the money that was in that briefcase. The jury was instructed, "if a defendant did not receive part of that money then you must find him not guilty on this count [bribery] as well as on the other substantive counts."

Murphy did not testify, but through argument of counsel it was urged that Murphy did not know that there was money in the briefcase that was passed. Thompson did testify and claimed he knew nothing whatsoever of the Murphy transaction and denied having ever received any of its proceeds. Both contentions were rejected by the jury, which found each defendant guilty on some counts, and not guilty on others. Again, the videotape evidence against the defendants, corroborated by the testimony of Murtha and other non-government witnesses, established an overwhelming case. Weinberg and Amoroso provided their usual testimony linking together the various audio and video tapes.

### III. PRETRIAL AND POST–TRIAL PROCEEDINGS

Extensive pretrial motions were made by all defendants in all three of these cases. Representatives Myers, Lederer, Thompson and Murphy all claimed legislative immunity under the speech and debate clause of the constitution, and pretrial appeals were heard by the Second Circuit on that issue. In all cases the district court's orders refusing to dismiss the indictments were affirmed. The key decision was written by Judge Newman of the Second Circuit in *U. S. v. Myers*, 635 F.2d 932 (CA2), *cert. denied*, 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980).

A number of other issues were raised by pretrial motion seeking dismissal of the in-

---

**6.** This instruction to the jury, that an interstate travel conviction was contingent upon Murphy's guilt of bribery, appears to the court now to have been more restrictive of the government and more favorable to defendant Murphy than the law requires.

dictment on grounds of governmental misconduct, denial of defendants' due process rights in the conduct of the investigation, entrapment as a matter of law, and various other issues which during the course of the proceedings have been loosely referred to as the "due process" issues.

All three of these cases were originally assigned to Judge Mishler of this court. In his original disposition of the "due process" motions Judge Mishler reserved decision on the ground that the motions could be dealt with more effectively after presentation of the government's case at trial. He indicated that if he found any merit to the due process claims, he would conduct a hearing between the government's case and the defendants' case and then decide the questions raised. Four days before the *Myers* case was to go to trial, however, Judge Mishler recused himself and these cases were reassigned to the undersigned.

Just before the trial began the "due process" arguments were again advanced by defendants who reasserted their desire for a pretrial hearing. By that time, Judge Fullam in the *Jannotti* case in Philadelphia had conducted many days of pretrial "due process" hearings but had been unable to resolve the questions presented, which he finally reserved for post-trial determination. Under those circumstances, this court ruled that the due process hearing would be deferred until the jury in the *Myers* case retired to deliberate, and then any additional testimony that was required could be heard before the court sitting without a jury.

As matters developed, defense counsel in *Myers* argued persuasively that this court's modified plan was impractical; as a result, the "due process" claims of the convicted defendants in the *Myers, Lederer*, and *Thompson* cases were heard simultaneously in January and February of 1981, at a consolidated hearing held shortly after the jury had found Lederer guilty.

The *Williams* trial did not take place until April, 1981, after the first "due process" hearing had been concluded; consequently, a separate "due process" hearing was conducted in June, 1981, and the post-trial motions in *Williams* will be decided separately after counsel have had an opportunity to brief the issues. All parties in all four cases were given the opportunity on the "due process" issues to rely upon all of the evidence developed, not only before this court in both "due process" hearings and in all four trials, but also before Judges Fullam, Penn and Bryant in their respective trials and due process hearings, to the extent that such evidence might be brought to this court's attention before determination of the post-trial motions.

This court recognizes that the lengthy "due process" hearings permitted in these matters have extended well beyond what would be appropriate in the usual criminal case. Conscious decisions and express rulings were made permitting a wide-ranging scope of inquiry, seemingly endless cross-examination by defense counsel of a seemingly endless list of witnesses, and extensive use of hearsay and opinion testimony. In addition, the court ordered the government to produce many internal documents of the justice department and the FBI. At times the proceedings more resembled a series of depositions and requests for document production in a securities fraud or antitrust case than a hearing to determine whether the government had violated the "due process" rights of defendants in a criminal prosecution. In most instances, even when the court had doubts about the suitability of a line of questioning or whether a document should be produced, decision was resolved in favor of the defendants.

There were substantial reasons for such liberality to defendants, unprecedented in this court's experience. In the first place, from the very beginning it was apparent that these were significant cases to the defendants, to the FBI, to the justice department, to the public, and perhaps even to the very structure of our governmental system. Large sums of money had been spent in the Abscam investigation. High-ranking members of Congress had been indicted. The integrity of both the FBI and the justice department had been vigorously

challenged. A novel investigative technique had been employed against members of Congress and others without prior specific suspicions.[7] And the entire matter had been given extensive national coverage in the news media, reflecting not only the importance of the criminal actions, but fundamental political and constitutional issues in which many segments of the population had an interest.

Second, since the United States Supreme Court has not yet expressly ruled on many of the legal issues presented, and the issues raised are novel questions of great public importance, final review by that body is a distinct possibility.

Third, it is advantageous for this court to have developed a complete record so that review on appeal can be final, without the need for a remand to develop further areas of possible inquiry. Already, enormous time and effort by all parties has been devoted to this case. Justice to the parties and to the public demands final resolution on one trip through the appellate review system if that is at all possible.

Fourth, the political, professional and business careers of the defendants have been destroyed or at least seriously compromised by the indictments, trials and convictions. Whatever final sentences might be imposed, the harm to these defendants from the mere fact of conviction was significant, thereby requiring meticulous review of every possible basis for vacating those convictions.

Fifth, although the cases before the undersigned were tried in the Eastern District of New York under the jurisdiction of the Second Circuit, all but one of the defendants reside in New Jersey or Pennsylvania under the jurisdiction of the Third Circuit. A serious claim was made by most of the defendants that the government had wrongly manufactured jurisdiction in the Eastern District of New York by scheduling the payoffs in this district to the prejudice

of those defendants who reside in the Third Circuit. Since there appears to be some conflict between the views of the Third Circuit and the Second Circuit on "due process" problems, *compare, U. S. v. Twigg*, 588 F.2d 373 (CA3 1978) *and Government of Virgin Islands v. Smith*, 615 F.2d 964 (CA3, 1980) *with U. S. v. Turkish*, 623 F.2d 769 (CA2 1980) *and Grochulski v. Henderson*, 637 F.2d 50 (CA2 1980), *cert. denied*, 450 U.S. 927, 101 S.Ct. 1383, 67 L.Ed.2d 358 (1981), it appeared fair to both the government and the defendants to explore all factors that even remotely suggested some possibility of relief to the defendants under the precedents of either the Second or the Third Circuit.

Seventh, the nature of the claims asserted by defendants—over-involvement of the government in creating the crimes charged, specific governmental misconduct during the course of the investigation, and suppression of exculpatory information during the course of the investigation and trial—dealt primarily with factors beyond the direct knowledge of the defendants, so that whatever evidence could be developed would have to come by way of the hearing from government records and government witnesses.

Eighth, in the Abscam case tried in Philadelphia, *U. S. v. Jannotti et al.*, Judge Fullam had conducted further "due process" hearings after the convictions and had found reasons for dismissing the indictments there. *U. S. v. Jannotti*, 501 F.Supp. 1182 (ED Pa.1980) (appeal pending). *See* discussion of Judge Fullam's decision in section VII, *infra*. In the course of his "due process" hearings, Judge Fullam at many points foreclosed testimony about the New York cases, and restricted his inquiry to matters that bore directly upon the Philadelphia phase of Abscam, a phase that focused primarily on local officials during a period of some 10 days at the very end of the investigation. In the present cases,

---

7. Of course, the idea that some congressmen may be dishonest or "on the take" is neither novel nor without foundation in our history. In this particular investigation, however, the undercover agents were not acting on any prior accusations of misconduct against any of these defendants.

which involved elected federal officials engaged in activities over some seven months, the need for a more wide-ranging inquiry seemed compelling.

In short, the procedures followed by this court and the rulings made throughout the course of the due process hearings were guided by a sensitive concern for the rights of these defendants, an awareness of the unsettled legal principles governing disposition of defendants' claims, and an appreciation of the public importance of the Abscam investigation in general and the conduct of these defendants in particular. Together, these factors persuaded the court that wherever possible, consistent with legitimate governmental needs for continued secrecy, open disclosure of the Abscam investigation and the government's handling of it was both necessary and desirable.

As a result of the foregoing, the court has before it, and has considered in making this decision, all of the testimony developed in four weeks of the *Myers* trial, three weeks of the *Thompson* trial, one week of the *Lederer* trial, five weeks of the *Williams* trial, three weeks of the first due process hearing, and one week of the second due process hearing, making altogether approximately 17 weeks of trial presided over by this court represented in approximately 20,000 pages of transcripts. In addition, the court has reviewed all of the testimony in the due process hearings before Judge Fullam, and those selected portions of the trials before Judges Fullam, Bryant and Penn, as well as the due process hearing before Judge Penn, that counsel have focused upon. The many volumes of the FBI's Abscam files from both headquarters in Washington and the Brooklyn-Queens office were reviewed *in camera*, resulting in directions to the government to produce all or parts of many documents. The court has also reviewed and considered the government's pre-prosecution memoranda, the so-called "Del Tufo memorandum", the "Blumenthal report" on publicity leaks, a large number of video and audio tapes and transcripts, and hundreds of other exhibits.

The post-hearing memoranda of counsel constitute a stack of briefs some six inches high. An even larger stack of motion papers was created by the pretrial, prehearing, and mid-hearing submissions of counsel, many of which were incorporated by reference into their final submissions. All of those papers have been read and carefully considered by the court.

With that background, the court next turns to an outline of the specific claims of the parties and, finally, to a discussion of the merits of those claims together with the court's findings and conclusions, where necessary, with respect to those claims.

## IV. DEFENDANTS' CLAIMS

### A. *Claims of The Myers Defendants.*

The four defendants in *Myers* have filed joint briefs in support of all post-trial motions and thus their arguments are referred to collectively. The *Myers* defendants essentially claim that the Abscam investigation did not uncover criminal conduct, but instead created or instigated any criminality that may be present, and that improper delegation of authority, lack of supervision, inadequate documentation and the reward system used by the government created such doubt as to the truth, reliability and integrity of the verdict as to require dismissal of the indictments. The *Myers* defendants urge, in effect, that notwithstanding their failure to claim entrapment at the trial, they are not precluded from now asserting a defense of "entrapment as a matter of law", or "objective entrapment". They urge that many states have recognized and legislatively adopted objective entrapment and that the federal courts should constitutionalize that trend.

More particularly, the *Myers* defendants argue that the government did not infiltrate or uncover ongoing criminal activity, but instead created such activity; that the government offered overwhelming inducements to the *Myers* defendants; that Abscam was conducted without adequate safeguards, particularly with respect to supervision of Weinberg; that the techniques employed by the government in Abscam were

"outrageous" within the meaning of *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); that there was entrapment as a matter of law; that the compensation of Weinberg as an informant is unconstitutional; that it is improper to undertake a general investigation into the corruptibility of members of a particular branch of government without some "well-grounded basis"; that as a matter of constitutional law the "so-called due process defense or objective strand of the entrapment defense" should be available to a defendant subjected to "outrageous governmental investigatory action"; that the destruction, erasure or unexplained loss of tapes requires an inference that the tapes contained exculpatory material; and that in an undercover investigation the verbal assertion by a potential target that he or she desires to act within the law forecloses any further investigation of that individual.

### B. *Thompson's Claims.*

Defendant Thompson advances arguments that are similar, although more focused. He urges what he characterizes as "the doctrine of governmental overreaching" as requiring dismissal here because the government instigated rather than discovered the crimes and because its selection of "targets" was arbitrary and unprincipled. Thompson further urges that the indictment should be dismissed because in the course of the Abscam investigation there were widespread and continuous violations of laws, regulations and guidelines in the control and monitoring of the informant Weinberg, in using Criden and other "middle men", in lacking reasonable suspicion before bringing public officials before the video cameras, and in ignoring or disregarding "red flags" and substantial legal questions that arose. Thompson further argues that inadequate documentation of the investigation, unauthorized disclosures of information to the press by the government, attempts by the government to intimidate witnesses, failure to observe the requirements of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1973), and other possible violations of law require

dismissal of the indictment against him. Finally, Thompson urges that the circumstances of his involvement with Abscam constitute entrapment as a matter of law.

### C. *Murphy's Claims.*

Defendant Murphy argues that the government's conduct of the Abscam investigation violated principles of fundamental fairness because the justice department targeted congressmen in violation of principles of separation of powers and the speech or debate clause, failed to take into account the nature of Murphy's duties as a legislator, and failed to consider the right of all citizens to petition Congress and Congressman Murphy for redress of grievances. Murphy further argues that his prosecution was the product of governmental overreaching in the creation and promotion of crime and that the government's outrageous creative activity was designed to lure Murphy into criminality without any indication of his predisposition or prior agreement to engage in wrongdoing. He further argues that as to him the government deliberately or recklessly created ambiguous and misleading evidence of criminality. Murphy's final argument focuses upon claimed misconduct by the government in the Abscam investigation and prosecution, and argues that the misconduct caused him specific prejudice. He contends that dismissal of the indictment would not harm any legitimate law enforcement purpose, but on the contrary would serve as a deterrent against any future Abscam-type abuses.

### D. *Lederer's Claims.*

Defendant Lederer claims he was deprived of due process and that he was the victim of entrapment as a matter of law because Abscam constitutes outrageous conduct on the part of government agents in that they created rather than discovered crime; allowed Weinberg and Amoroso to act in an uncontrolled fashion; manufactured jurisdiction over defendants; selected a venue that would avoid the Third Circuit's decision in *U. S. v. Twigg,* 588 F.2d 373 (CA3 1978); provided improper incentives

for Weinberg; appealed to the civic duty of targets to involve them in Abscam; improperly used "middle men"; attempted to mislead the court and jury about the creation of the "asylum scenario"; permitted an FBI agent, the government prosecutor and Weinberg to separately contract to write books about Abscam; failed to safeguard against entrapment; trapped Lederer into giving a false statement to the FBI; withheld evidence of Weinberg's criminal record; leaked untruthful stories to the press in order to interfere with cooperation among codefendants; destroyed evidence; withheld prior statements of Amoroso and Weinberg; violated the principles of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1973); and instructed agents to testify falsely and to withhold information at the trial. Lederer further argues that he was entrapped as a matter of law.

### E. Claims of the Government.

The government argues that the Abscam investigation in its totality was both appropriate and constitutional, that the rights of none of the defendants were violated by the investigation and that there was no exculpatory evidence withheld from the defense. In the government's view, all of the defendants' "due process" contentions basically fall into two categories, neither of which has validity: governmental "over-involvement" in the creation of criminal activity, and the government's failure to take measures to ensure that innocent people would not be wrongfully ensnared and convicted. The government urges that defendants' claims

> cannot be considered in the abstract, for the facts as developed at the trials reveals [sic] a collection of unscrupulous public officials who were never "victimized" by the informant or the intermediaries and whose guilt was clear because they were clearly guilty, not because they had been manipulated to appear in compromising positions before the cameras. Government's memorandum at 1.

The government further argues that the Abscam investigation was pursued in good faith and conducted professionally in view of the circumstances, that no right of any defendant was infringed and, finally, that whether an operation such as Abscam is "good" or "bad" is a matter to be decided initially by the executive branch of our government, subject to legislation by Congress, but does not present judicial questions under the due process clause.

As an alternative to dismissal of the indictment, all defendants also move for a new trial on various grounds, including insufficient evidence, errors in the charge, and *Brady* violations. *See* section IX, *infra*.

## V. GENERAL DISCUSSION OF BASIC LEGAL CONCEPTS

Whenever government agents, in carrying out their law enforcement functions, assist criminals or participate with them in their criminal activity, questions arise as to the propriety or legitimacy of the government's conduct and as to whether the law should punish a person for engaging in governmentally instigated criminal activity. The answers must draw on considerations of philosophy, psychology, statutory construction, constitutional law, practical needs of law enforcement, and even undifferentiated visceral feelings about right and wrong.

### A. Entrapment.

Much of the judicial discussion of these questions has focused on the ideas generally encompassed in the concept "entrapment". Although virtually all judges have agreed that an innocent person who was "entrapped" by government agents into committing a criminal act should not be convicted, there is less agreement on the proper principles underlying the concept of entrapment and on what factors do or do not constitute entrapment.

Under the so-called "subjective" approach to the defense of entrapment, two factors must be considered: Was the defendant's criminal conduct "induced" by the government agent? If it was, was the defendant "predisposed" to commit the crime? This subjective approach focuses upon the con-

duct and propensities of the particular defendant in each case. It is for the jury to determine, first, whether there is sufficient evidence of "inducement" and, if so, whether the government has proven beyond a reasonable doubt that the defendant was "predisposed".[8] In theory, the subjective approach to entrapment is grounded in legislative intent: if an otherwise innocent person was entrapped by a government agent into performing a criminal act, the legislature never intended that his conduct be punished. *Sorrells v. U.S.*, 287 U.S. 435, 52 S.Ct. 210, 77 L.Ed. 413 (1932); *U.S. v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973).

"Objective" entrapment is a term applied to either of two different concepts. Under one view of "objective" entrapment the focus is not upon the propensities and predispositions of the individual defendant, but instead upon an objective standard of "persons who would normally avoid crime and through self-struggle resist ordinary temptations", *Sherman v. U.S.*, 356 U.S. 369, 384, 78 S.Ct. 819, 826, 2 L.Ed.2d 848 (Frankfurter, J., concurring), in order to determine whether the inducement tendered by the government agent was unacceptable.[9]

The second view of "objective" entrapment focuses upon the conduct of the government agents in each particular case to determine whether that conduct "falls below standards, to which common feelings respond, for the proper use of governmental power". *U.S. v. Russell*, 411 U.S. at 441, 93 S.Ct. at 1647 (Stewart, J., dissenting). However, and despite eloquent arguments in several dissenting and concurring opinions, *Sorrells*, 287 U.S. 435, 52 S.Ct. 210, 77 L.Ed. 413; *Sherman*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848; *Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366; and *Hampton*, 425 U.S. 484, 486, 96 S.Ct. 1646, 1648, 48 L.Ed.2d 113 the "objective" approach to entrapment has never been accepted by any majority of the Supreme Court.

Some confusion has arisen because "objective" entrapment, the view that over-involvement of the government in the commission of a crime requires dismissal of an indictment, has also been called "entrapment as a matter of law". Further semantic confusion has arisen, however, because the term "entrapment as a matter of law" has also been applied to a situation where, on the evidence presented, no jury could find beyond a reasonable doubt, that the defendant was predisposed to commit the crime that was induced by the government agents. *Sherman v. U.S.*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848; *see U.S. v. Jannotti*, 501 F.Supp. at 1200. Under that view, "entrapment as a matter of law" simply means that insufficient evidence was presented to warrant the case going to the jury on the issue of defendant's predisposed state of mind.

Entrapment is a difficult, conceptually slippery, and philosophically controversial concept. Ever since *Sorrells v. U.S.*, 287 U.S. 435, 52 S.Ct. 210, 77 L.Ed. 413 (1932), the Supreme Court has divided sharply on the standards to be applied in reviewing the conviction of a person whose criminal conduct was in part facilitated by government agents. In *U.S. v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), a Supreme

8. Although some courts have required the defendant to admit commission of the crime before he can raise the entrapment defense, *e. g., Sylvia v. U.S.*, 312 F.2d 145 (CA 1), *cert. denied*, 374 U.S. 809, 83 S.Ct. 1694, 10 L.Ed.2d 1032 (1963); *U.S. v. Johnston*, 426 F.2d 112 (CA7 1970); *U.S. v. Watson*, 489 F.2d 504 (CA3 1973), the more recent view of the Second Circuit is that a defendant may deny having committed the crime and simultaneously claim that he was entrapped into the conduct which is claimed to be criminal. *U.S. v. Valencia*, No. 79–1365–66 (CA2 Mar. 5, 1981) (amending opinion of Sept. 18, 1981).

9. This theory has been argued by the defendants here, bolstered by the assertion that "every man has his price". No caselaw has been offered in support of this theory of "objective" entrapment. Moreover, even assuming that "every man has his price", that fact does not under any known legal precedent require dismissal of charges against the man whose "price" has been determined and illegally paid. At least as to those who violate a public trust, if they accept their "price" for being corrupt, they should also pay the penalty when caught in the act.

Court majority of five claimed to adhere to *Sorrells* as a precedent of long standing that had already once been reexamined and implicitly reaffirmed in *Sherman v. U.S.*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). Writing for the court in *Russell*, Justice Rehnquist pointed out that "since the [entrapment] defense is not of a constitutional dimension, Congress may address itself to the question and adopt any substantive definition of the defense that it may find desirable." 411 U.S. at 433, 93 S.Ct. at 1643 (footnote omitted).

Four Supreme Court decisions are central to the issue of entrapment. *Sorrells*, 287 U.S. 435, 52 S.Ct. 210, 77 L.Ed. 413; *Sherman*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848; *Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366; and *Hampton*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113. Familiarity with the majority, concurring, and dissenting opinions in those decisions is assumed. From those decisions as a whole it appears that the "objective" view of entrapment as espoused by Justice Brennan in *Hampton* has never been accepted by a majority of the Supreme Court. The "subjective" view has been adopted in *Sorrells, Sherman* and *Russell* and appears to be still acceptable to a present majority of the current Supreme Court bench, at least in most cases, where a defendant's predisposition has been established.

*Hampton* presents a more complex picture. There, three justices voted to solidify the subjective approach so that under no circumstances, regardless of how egregious the governmental conduct, could a defendant who was found by a jury to have been predisposed to commit the crime have the indictment dismissed for governmental misconduct. 425 U.S. 484. Three other justices believed that the circumstances showed that governmental officials had purposefully created the crime in *Hampton* and that such creative activity by governmental officials required dismissal despite defendant's predisposition to commit the crime. 425 U.S. at 495, 96 S.Ct. at 1652–53 (Brennan, J., dissenting). Two other justices in an opinion written by Justice Powell found that *Hampton* was controlled by *Rus-*

*sell*, that Hampton had not even raised the issue of predisposition, and that his entrapment defense, therefore, failed for lack of proof. 425 U.S. at 490, 96 S.Ct. at 1650 (Powell, J., concurring). Justice Powell declined, however, to close the door entirely upon the possibility of court intervention in an extreme case. He refused to accept the premise "that, no matter what the circumstances, neither due process principles nor [the Supreme Court's] supervisory power could support a bar to conviction in any case where the Government is able to prove predisposition." 425 U.S. at 495, 96 S.Ct. at 1653. In footnote, Justice Powell added:

I emphasize that the cases, if any, in which proof of predisposition is not dispositive will be rare. Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction. This would be especially difficult to show with respect to contraband offenses which are so difficult to detect in the absence of undercover Government involvement. One cannot easily exaggerate the problems confronted by law enforcement authorities in dealing effectively with an expanding narcotics traffic * * * which is one of the major contributing causes of escalating crime in our cities. * * * Enforcement officials, therefore, must be allowed flexibility adequate to counter effectively such criminal activity. 425 U.S. at 496 n.7, 96 S.Ct. at 1653 n.7 (citations omitted).

Thus as the Court divided in *Hampton*, with Justice Stevens taking no part: three judges would make predisposition the only issue; three judges would eliminate predisposition entirely; and the decisive two concurring votes, expressed in Justice Powell's opinion, indicate that predisposition is not only relevant but will be dispositive in all but the "rare" case where police over-involvement in the crime reaches "a demonstrable level of outrageousness". Since Hampton had been predisposed, and since the police involvement in his crime was not "outrageous", his conviction was affirmed. The three dissenting judges would elimi-

nate consideration of predisposition entirely and would instead devote their attention only to governmental misconduct. While they would prefer to be more restrictive of permissible governmental involvement in crime than Justice Powell's test of "outrageousness", the dissenters' position *a fortiori* accepts the "outrageousness" standard, making it the point in the continuum of escalating police involvement in crime where five members of the present court agree that a conviction should be overturned and an indictment dismissed.

Until further word from the Supreme Court, therefore, as a matter of strict legal precedent, this court must assume that while the subjective view of entrapment is the general guide, it is nevertheless subject to an overriding exception that under either the court's supervisory power [10] or the due process clause, a predisposed defendant cannot be convicted if police over-involvement in his crime reaches "a demonstrable level of outrageousness". *See U.S. v. Johnson*, 565 F.2d 179, 181 (CA 1 1977).

### B. *Outrageousness.*

What conduct by law enforcement officials would be "outrageous"? No clear standard has evolved. Many partially relevant factors have been discussed, argued, and either accepted or rejected in various opinions on the subject. The court has reviewed and carefully considered numerous cases, including the following: (1) United States Supreme Court: *Sorrells v. U.S.*, 287 U.S. 435, 52 S.Ct. 210, 77 L.Ed. 413; *Sherman v. U.S.*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848; *U.S. v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366; *Hampton v. U.S.*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113; (2) Second Circuit Court of Appeals: *U.S. v. Viviano*, 437 F.2d 295 (CA2), *cert. denied*, 402 U.S. 983, 91 S.Ct. 1659, 29 L.Ed.2d 149 (1971); *U.S. v. Nunez-Rios*, 622 F.2d 1093 (CA2 1980); *U.S. v. Corcione*, 592 F.2d 111 (CA2 1979); *U.S. v. Archer*, 486 F.2d 670 (C.A.2 1973); *U.S. v. DeSapio*, 435 F.2d 272 (CA2 1970), *cert. denied*, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971); *U.S. v. Brown*, 603 F.2d 1073 (CA2 1979); (3) Cases from other circuits: *U.S. v. Smith*, 538 F.2d 1359 (CA9 1976); *U.S. v. Quinn*, 543 F.2d 640 (CA8 1976); *U.S. v. Graves*, 556 F.2d 1319 (CA5 1977), *cert. denied*, 435 U.S. 923, 98 S.Ct. 1485, 55 L.Ed.2d 516 (1978); *U.S. v. Leja*, 563 F.2d 244 (CA6 1977), *cert. denied*, 434 U.S. 1074, 98 S.Ct. 1263, 55 L.Ed.2d 780, 436 U.S. 948, 98 S.Ct. 2853, 56 L.Ed.2d 790 (1978); *U.S. v. Johnson*, 565 F.2d 179 (CA1 1977), *cert. denied*, 434 U.S. 1075, 98 S.Ct. 1264, 55 L.Ed.2d 780 (1978); *U.S. v. Twigg*, 588 F.2d 373 (CA3 1978); *U.S. v. Szycher*, 585 F.2d 443 (CA10 1978).

Of all the foregoing cases, only one, the Third Circuit's decision in *Twigg*, has actually held that an indictment should be dismissed under the supervisory power or due process clause because governmental conduct was "outrageous". Although most of the other cases recognize the possibility of such a conclusion, none of them has held under the circumstances presented to the court that dismissal of the indictment was an appropriate remedy.[11]

The central issue now tendered by defendants in this case is whether the circum-

---

10. When invoked to dismiss an indictment, a federal district court's supervisory power over law enforcement appears to be more theoretical than real. It is to be applied with caution even when a defendant asserts a violation of his own rights. Much less may it be applied when a defendant relies upon the infringement of another person's rights or on generalized incidents of "misconduct". *U.S. v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). Even "knowing and bad faith hostility to another person's fundamental constitutional rights" is insufficient to warrant dismissal of an indictment. In short, there must be "a restrained application of supervisory power". *Id.* 100 S.Ct. at 2446. "After all, it is the defendant, and not the constable, who stands trial." *Id.*

A further problem with the court's supervisory power is that a district court is not granted power under the Federal Rules of Criminal Procedure to dismiss an indictment "in the interests of justice". That consideration authorizes only a new trial. *U.S. v. Brown*, 602 F.2d 1073 (CA2 1979); *U.S. v. Lai Ming Tanu*, 589 F.2d 82 (CA2 1978).

11. As noted earlier, *Sherman* resulted in dismissal because there was "entrapment" as a matter of law.

stances of the Abscam investigation and the government's conduct toward the particular defendants reached "a demonstrable level of outrageousness" sufficient to require dismissal of the indictments. Before addressing the circumstances of Abscam and the particular problems of these cases, however, it may be useful to list many of the factors that have been the focal point of discussion in the cases cited by counsel. Among those factors are the following:

1. Did the government agents initiate or instigate the criminal activity?

2. Was the government's participation essential to the crime?

3. Had the defendant engaged in similar criminal activity before the government agent came on the scene?

4. Was the activity of the government agent, when viewed alone, criminal?

5. How easy or difficult is the job of law enforcement officers in combatting the kind of criminal activity involved?

6. Do the police need to use the kinds of tactics utilized in order to effectively detect the crime?

7. Did the government provide the instruments or implements (e.g., drugs, laboratory equipment, chemicals, money, suitcases) to commit the crime?

8. If an informant was used, was the informant reliable? Did he have a criminal record?

9. Was the informant paid a fee contingent upon the number or importance of defendants apprehended or convicted?

10. Did the informant violate the law, or urge others to violate it?

11. Did the informant or the undercover agents exert pressure or use threats on defendants to induce them to commit the crime?

12. Did the informant or undercover agents engage in other activities, not directly related to the crime, which violated the law or were dishonorable?

13. Did the government agents show a proper regard for judicial and police processes?

14. Did the government's agents perjure themselves by false reports to the police, to a judge, or to a grand jury?

15. Did the activities of the agents actually harm innocent citizens not the subject of the investigation?

16. Did the activities of the government agents have any direct adverse social consequences?

17. Did the undercover agents stand by while crimes were being committed in their presence?

18. What was the value to law enforcement of the information being obtained by the informant and undercover agents?

19. How important was the crime and its detection in the overall social scheme?

20. How closely were the informant's activities supervised by the government agents?

21. Was the claimed outrageous conduct of the agents an isolated instance, or was it part of a widespread and continuous system?

22. Did the investigative technique complained of produce a substantial danger of unreliability and thereby potentially expose innocent people to prosecution and possible conviction?[12]

Although there are some indications from some dissenting justices in the United States Supreme Court that undercover activities, deception, trickery and similar tech-

---

12. Except for *Twigg*, no factors, either alone or in combination, have yet required dismissal of an indictment or conviction against a defendant found to have been predisposed to commit the crime. Of course, where there has been a direct violation of a defendant's particular constitutional rights, such as an illegal search and seizure, involuntary confession, *Miranda* violation, or infringement of right to counsel, appro-

priate sanctions have been imposed. When that occurs, there is no need to reach the constitutional issue raised here which presents a more amorphous, generalized concept of a fifth amendment due process violation based on "outrageous" governmental conduct that does not directly affect a specific constitutionally protected interest of the defendant.

niques by police should be impermissible under our constitution, the great majority of opinions on the subject, and all holdings by the Supreme Court and, as far as this court is aware, by the circuit courts as well, have recognized that in order to combat crime in our society it is permissible for police to employ artifice and stratagem, to use undercover agents who deal directly with criminals, and to present opportunities and facilities to them for the commission of an offense.

## VI. SPECIFIC DISCUSSION OF DEFENDANTS' CLAIMS

We turn now to a discussion of the merits of the defendants' claims. For discussion purposes the claims will be divided into four groups:

A. General Nature of Abscam.
B. Specific Operations of Abscam.
C. Weinberg and His Conduct.
D. Miscellaneous Arguments.

### A. *General Nature of Abscam.*

1. *Objective Entrapment and Entrapment as a Matter of Law.*

■ All defendants urge, as a primary contention, that the indictment should be dismissed because the Abscam investigation did not uncover criminal conduct, but instead created and instigated it. This argument challenges the essential nature of the government's "sting" operation, which presented to defendants a false and fictitious but convincing "scenario" of a wealthy sheik willing to pay cash for promises of assistance in his immigration to the United States. Defendants argue that this scenario induced them to participate in criminal events they otherwise would not have engaged in, simply because absent the government's actions they would not have had the opportunity to do so—at least with this sheik.

The central defect in defendants' argument is that it simply does not represent the law as established by the United States Supreme Court. As noted in the "general discussion", section V, *supra*, eloquent dissents have urged that objective entrapment be adopted as a constitutional principle so that whenever a government agent provided the impetus for a crime, prosecution would be barred. If that were the law, clearly these convictions would have to be dismissed; indeed, if that were the law, these prosecutions would never have been brought. However, and as already noted, whenever the dissenting or concurring justices on the Supreme Court have urged objective entrapment as a principle of constitutional law or as a basis for invoking the supervisory power, see *Hampton*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113; *Sorrells*, 287 U.S. 435, 52 S.Ct. 210, 77 L.Ed. 413; *Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366; and *Sherman*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848, the majority has rejected the concept. Thus, except for the possible availability of an "outrageous governmental conduct" argument, discussed below, defendants' entrapment claims in these cases are restricted to principles of subjective entrapment, where the creative activity of the government entraps into criminal conduct a defendant who was not predisposed to commit the crime. As already noted, the focus of this defense is upon whether the defendant was predisposed to commit the crime.

■ Predisposition is generally a question of fact to be determined by the jury. Of all the defendants before the court in these three cases, only defendant Lederer requested that the issue of entrapment be submitted to the jury, and, of course, the jury found him predisposed, a decision that cannot be overturned because it is supported by sufficient evidence. Since the other defendants did not request an entrapment charge, the issue of subjective entrapment is no longer open to them.[13]

Substantial parts of the memoranda submitted by the *Myers* defendants focus upon

---

**13.** The decisions by Myers, Errichetti, Criden, Johanson, Thompson and Murphy to withhold entrapment from the jury was not oversight; on the contrary, it was a calculated move in each defendant's trial strategy.

why this court should apply the principles of objective entrapment. But in view of the consistent position taken by the United States Supreme Court against the arguments of its dissenters, it would be improper for this court to decide these cases by adopting objective entrapment. Presumably, the Supreme Court could overrule its clear precedents to the contrary and impose such a fundamental change on our criminal justice system. Similarly, it is within the province of Congress to define the entrapment defense in objective terms, and the fact that a number of states have done so might be persuasive argument to a legislator. But the argument is unpersuasive to this district judge in light of the clear federal precedents that reject objective entrapment.

### 2. "Outrageous" Government Conduct.

■ Even if objective entrapment is not to be the standard, defendants argue, these indictments should be dismissed because the government's handling of the investigation was "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." This argument stems from *Russell*, 411 U.S. at 431–32, 93 S.Ct. at 1642–43, where Justice Rehnquist, speaking for the majority, acknowledged that such a situation of "outrageous" conduct "may some day be presented". Justice Rehnquist repeated that thought in *Hampton*, 425 U.S. at 489, 96 S.Ct. at 1649.

It is important to recognize, however, that in neither *Russell* nor *Hampton* was the questioned governmental conduct held to be "outrageous". Nor has any other decision of the Supreme Court found law enforcement officers' conduct to be so "outrageous" as to require dismissal of an indictment. Thus, even though the Supreme Court has yet to be confronted with or to offer a description of circumstances suffi-

ciently outrageous to warrant dismissal, the governing principle remains that in some case, under some circumstances, the conduct of law enforcement officials may some day bar prosecution. Defendants argue that those cases, those circumstances and that conduct have arrived with Abscam.

It is clear that mere instigation of the crime does not render law enforcement activity "outrageous". Here, the government presented a fictitious sheik, seeking to buy favorable legislative action. Undercover agents offered money in return for defendant legislators' promises to introduce a private immigration bill. In simple terms, bribes were offered by the undercover agents and accepted by the defendant congressmen.[14]

Clearly, the government agents created the opportunity for criminal conduct by offering the bribes. But their involvement falls far short of being "outrageous" for two reasons. In the first place, each of the legislators could simply have said "no" to the offer. *U.S. v. Myers*, 635 F.2d at 939. *Three* other legislators faced with identical offers, Senator Pressler, Congressman Patten and Congressman Murtha did precisely that as shown by the videotapes in evidence as DP Exs. 22, 21, and *Thompson* trial Ex. 29. Second, the extent of governmental involvement here is far less than that in *Hampton*, where the government not only supplied heroin for the defendant to sell, but also produced an undercover agent to buy it from him. Even under those circumstances, where the government was active on both sides of a narcotics sale, the Supreme Court did not consider the agents' conduct to be "outrageous"; a fortiori here, where the agents acted only on one side, by offering money to congressmen in return for favors, the involvement of the undercover agents was not "outrageous".[15]

---

14. With defendant Murphy the word "monies" might better be substituted for "bribes", because the jury found him not guilty of bribery, but guilty of receiving a criminal gratuity and of conflict of interest. For present purposes, however, the principle remains the same.

15. A closer analogy to *Hampton* would be if the FBI, in order to prosecute the middlemen Criden and Errichetti, had not only offered the bribe money, but also supplied to them "undercover" congressmen to accept the bribe. Clearly, that did not occur here. On this record it is apparent that, using their own resources

### 3. *Selection of "Targets"*.

Defendants argue that Abscam was "outrageous" because its selection of congressional targets was arbitrary and unprincipled. Early in the first due process hearing this court stated that in the absence of evidence to the contrary it would assume that there was no "probable cause" or even "reasonable suspicion" which might be used as a predicate for making a bribe offer to any of the defendant congressmen. No evidence is before the court that any of the defendant congressmen committed any prior similar violations or engaged in any course of conduct or other circumstances that would warrant suspicions of criminality in the conduct of their legislative affairs.[16]

Under these circumstances, defendants argue, to permit targets to be selected by middlemen violated due process because it did not provide sufficient protection to the innocent. Both legally and factually the argument fails. On the legal side, Judge Newman noted on the earlier appeal in *Myers* that the constitution does not require reasonable suspicion before a congressman may be made the subject of an undercover sting. *U.S. v. Myers*, 635 F.2d at 940–41. *See also U.S. v. Ordner*, 554 F.2d 24 (CA2 1977).

Factually, too, the argument is undercut by what happened with representative Patten and Senator Pressler, who had been brought to the undercover agents by middleman Silvestri. DP Exs. 21 & 22, respectively. Neither one apparently knew he had been brought before the sheik's representatives to be offered money in return for a promise of favorable legislative action. However, neither one was overwhelmed by the circumstances, and each declined the

offer. Pressler, particularly, acted as citizens have a right to expect their elected representatives to act. He showed a clear awareness of the line between proper and improper conduct, and despite his confessed need for campaign money, and despite the additional attractiveness to him of the payment offered, he nevertheless refused to cross into impropriety.

The court is convinced that the defendant congressmen appeared through a "self-selecting" procedure that involved the other defendants as well. The agents did not set out to offer bribes to any particular congressman. They set no standards, established no criteria. Instead, the middlemen, Errichetti, Criden and Silvestri, carried the word that money was there for the taking by any congressman who would promise to give legislative aid to the sheik's need for asylum in the United States. Weinberg's description of Abscam accurately characterizes what happened: "We put out the word that money was available, we had a honey pot and the flies came." Schwartz Trial Tr. 2.65 (Sept. 11, 1980).

Uncontroverted testimony established that no prospect was rejected or vetoed either by the agents or by higher authorities in the justice department. No congressional defendant was forced to attend the videotaped meeting, and no congressman was contacted directly by any of the undercover agents. Prior to the payoff meetings all contacts with the congressmen were through the middlemen, who apparently believed the sheik's offer, who claimed to have influence with the congressmen, and who claimed to be able to produce congressmen willing to take bribes. With the convicted congressmen, these claims proved accurate; with some other legislators, the middlemen

and without assistance or even directions by the agents, the middlemen sought and produced congressmen who would take the money.

**16.** The government claims that with respect to at least some of the defendants it does have such information available. The supporting exhibits proffered at the hearing, DP Exs. 80, 81, 82, & 83, were excluded from evidence when the government refused to identify for defendants its sources of information. The govern-

ment requested that the issue remain open for further evaluation in the event the court should conclude that a lack of predicate information was fatal to the government's case. Since the court has concluded that prior suspicion of criminal conduct by these defendants was not a constitutional predicate to offering them Abscam money, no further attention need be directed to the excluded exhibits.

did not live up to the abilities they had boasted of. In some cases, as noted above, after the legislator appeared, he rejected the offer of money.

With each defendant brought before the TV cameras, the criminal nature of the proposed deal was made clear. Each of the congressmen was a sophisticated politician who clearly was aware what was being requested of him and what the money was being offered for. While Amoroso and Weinberg talked around the point somewhat and did not mention the word bribe in the on camera discussions, they handled the matter in each case as tactfully and delicately as one might suppose, given the nature of their undercover role as agents of foreign principals offering a bribe to a high public official.[17] But, as the videotapes clearly showed and as the juries necessarily concluded, each congressman was aware of the criminal nature of the transaction, and each acted wilfully.

The claim that the justice department "targeted" only supporters of Senator Kennedy in his presidential race was unsupported by the evidence.

In short, on this record it is clear that those defendants who appeared and accepted bribes were not "targets" in the sense that any government agent selected them for some sort of "honesty test"; instead, each was a willing volunteer seeking illegal and corrupt payments.

4. *Size of Inducements.*

All defendants argue that the inducements offered to the congressmen were overwhelming, designed to overpower their otherwise adequate resistance and to induce honest and innocent people to commit a crime they would normally avoid.[18] Congressmen Myers, Lederer, Thompson and Murphy were each given $50,000. In addition, each was told that the sheik would invest money in the congressman's district. The inducements were clearly improper in the case of the cash payments, although arguably proper in the case of promised investments. Even with the investments, however, at least some of the congressmen seemed more interested in obtaining deposits in favorite banks than in truly developing the resources of their own districts. With Murphy, moreover, there was the added transaction of a contemplated loan to enable him and his business partner to buy a shipping company.

In another Abscam matter relating to a new gambling casino, Errichetti is alleged to have received part of a $100,000 payment made by the undercover agents. In addition, he seems to have been promised a lucrative job with the casino once it opened. Criden first contacted the undercover agents when he sought financing for a casino; if successful, he and his law firm would have received a fee that ran in seven figures. Later activities by both Errichetti and Criden demonstrate, however, that they produced bribe-taking congressmen because of the cash they received as part of the payoff. There is no evidence to connect their motivations for these crimes with their hoped-for bonanzas if the casino project went ahead. Certainly none of these defendants were in the position Judge Fullam found Jannotti and Schwartz to be in: "either take the bribe or lose the investment for your community."

While there may be "inducements" that are "overwhelming", such as a threat

---

17. In another Abscam incident, agent McCarthy became flustered and thrust an open briefcase containing $100,000 at the public official. This action was criticized by Errichetti as too abrupt, and he explained that more subtle means must be used to avoid embarrassing the public officials.

18. The Second Circuit, in *United States v. Viviano*, 437 F.2d 295 (1971), commented that the element of inducement relates simply to the government's initiation of the crime and not to the degree of pressure exerted. "The degree of pressure is properly considered under the element of propensity, as it has direct bearing on the accused's willingness to respond to the inducement of the agent." 437 F.2d at 299 n.2.

Since subjective entrapment is removed from this case by the jury's verdict against Lederer and by the other defendants' failure to assert it at the trial, the size of the inducement is considered here only in connection with defendants' claim that the agent's conduct was "outrageous".

against the life of a loved one, when the inducement is nothing but money or other personal gain, this court does not believe that the size of the inducement should be a determinative factor in whether a public official can be prosecuted for accepting it. No matter how much money is offered to a government official as a bribe or gratuity, he should be punished if he accepts. It may be true, as has been suggested to the court, that "every man has his price"; but when that price is money only, the public official should be required to pay the penalty when he gets caught. In short, as a matter of law, the amount of the financial inducements here could not render the agents' conduct outrageous or unconstitutional.

But even if the size of the inducements were relevant, on the facts here they do not approach "overwhelming". The undercover agents were dealing with members of Congress, sophisticated people who function at the highest level of our government. In these inflationary times, $50,000 is simply not an overpowering sum of money. The agents sought to keep the bribes reasonable and realistic in light of all the circumstances, and the sheer length of time Abscam ran without raising suspicions or being exposed testifies to the agents' success in making all aspects of the bribe offers seem real.

Moreover, there were several participants in each of these transactions, so the amount of bribe money each congressman could expect to actually receive varied from between $5,000 and $20,000. Furthermore, it is evident that the inducements offered were not so great as to cause every official who appeared before the cameras to agree to commit a crime, because Senator Pressler, Congressman Patten and Congressman Murtha all refused. Nor do we know how many congressmen, if any, were approached by the middlemen, offered the $50,000, and refused outright to even visit with the sheik's representatives to discuss the matter. Taken together, all these factors make it clear that the inducements offered were not overwhelming. The difference between those public officials who took bribes and those who refused cannot be found by examining the inducements offered. Honest congressmen would refuse a bribe offer; dishonest ones took the money.

Judge Fullam, in his due process ruling in *Jannotti*, found the inducements offered by the government to be so "attractive" and "exceedingly generous" that defendants' acceptance of the money could not establish proof of predisposition, and he therefore held that the inducements resulted in entrapment as a matter of law. It may be that he reached that conclusion because the bribe money was forced on defendants by threats of withholding the hotel investment, a substantial benefit to their city, if defendants did not take the money. To the extent that Judge Fullam may have felt that the amount of a bribe offer, standing alone, may insulate its recipient from prosecution, this court respectfully disagrees.

5. *Need for the Investigative Tactic.*

A vital factor in evaluating the government's conduct is whether there was any particular need for the kind of investigative tactic employed. The Supreme Court has recognized with drug-related offenses that undercover activities by governmental agents is necessary for proper law enforcement:

> The illicit manufacture of drugs is not a sporadic, isolated criminal incident, but a continuing, though illegal, business enterprise. In order to obtain convictions for illegally manufacturing drugs, the gathering of evidence of past unlawful conduct frequently proves to be an all but impossible task. Thus in drug-related offenses law enforcement personnel have turned to one of the only practicable means of detection: the infiltration of drug rings and a limited participation in their unlawful present practices. Such infiltration is a recognized and permissible means of investigation; if that be so, then the supply of some item of value that the drug ring requires must, as a general rule, also be permissible. For an agent will not be taken into the confidence of the illegal entrepreneurs unless he has something of value to offer them. Law enforcement tactics such as this can

hardly be said to violate "fundamental fairness" or "shocking to the universal sense of justice." *U.S. v. Russell,* 411 U.S. at 432, 93 S.Ct. at 1643 (citation omitted).

Although discovered and prosecuted less frequently than drug trafficking, political corruption through bribery is regrettably found among public officials, not only in this country but abroad. While this court is not prepared to characterize the bribery of public officials as "a continuing, though illegal, business enterprise", clearly it is not simply a "sporadic, isolated criminal incident". Like drug offenses, bribery is difficult to detect. Both are "victimless crimes" in the sense that no one with knowledge of the usual transactions has a motive to report the illegality to law enforcement officials.

Moreover, with bribery, nothing more is required than the quick passing of money in return for a promise of performance by the public official of an act that appears to be an appropriate part of his public duties. With drug deals, at least one part of the transaction is clearly illegal—the contraband. With bribery, both parts of the transaction are apparently legitimate: (1) money and (2) actions by public officials. Detecting bribery, therefore, is probably even more difficult than detecting drug offenses.

Some would say, however, that mere difficulty of detection does not create a need for undercover, infiltrating tactics such as were used in Abscam. More is needed, specifically a serious harm to society, and there are those who would argue that bribery and corruption in our public officials should be viewed with a tolerant "boys will be boys" attitude. This argument the court rejects categorically. Honesty, integrity, truthfulness and sincerity are essential qualities for effective leadership in our society. Tolerance of corruption has no place here. The cynicism and hippocracy displayed by corrupt officials, pretending to serve the public good, but in fact furthering their own private gain, probably pose a greater danger to this country than all of the drug traffickers combined. Corrupt leaders not only betray their constituents, but also contribute to a moral decay in American society that many view as the forerunner of economic, political and social disaster.

This court believes that the great majority of government officials, including those in Congress, are honest, hard-working, dedicated and sincere. However, the government needs to have available the weapons of undercover operations, infiltration of bribery schemes, and "sting" operations such as Abscam in order to expose those officials who are corrupt, to deter others who might be tempted to be corrupt, and perhaps most importantly, to praise by negative example those who are honest and square-dealing. Without the availability of such tactics, only rarely would the government be able to expose and prosecute bribery and other forms of political corruption.

### 6. *Lack of Reliability.*

One of the central notions running through the concepts of entrapment, governmental overinvolvement in crime, and due process violations for "outrageousness" is a deep judicial concern that juries' convictions be reliable measures of defendants' culpability. Courts must intervene when conduct by a government agent, or for that matter by any other person, creates a substantial risk that the "guilty" verdict is not a reliable evaluation of what a defendant did.

With these Abscam verdicts, reliability is high. In each of these cases the essence of the government's case was found on the videotapes. The full meetings with congressmen were recorded from start to finish, with no editing of the tapes either during or after the meetings. A more reliable basis for conviction can hardly be imagined. Through the videotapes the juries were permitted to see the actual crimes committed. Compared to the ordinary trial where oral testimony can at best only partially recreate an event, the reliability of the Abscam evidence was increased many

times over.[19] Not only was there no question of the actual words used by the participants, but the jury could also perceive the added dimensions of tone of voice, timing of comments, and even the defendants' gestures and mannerisms. The issue of "credibility", determining whether the events occurred as the government contends, an issue that dominates so many criminal trials, was virtually eliminated from these trials. Thus, there is absent from the reliability calculus one of the major hazards to truth and justice that is present when only oral testimony recreates the events.

Finally, review of the tapes in each case confirms that the jury was not only authorized, but virtually compelled to find each of the congressional defendants guilty.

### B. *Specific Operation of Abscam.*

#### 1. *Inadequate Safeguards.*

■ Defendants argue that Abscam was conducted "without adequate safeguards", particularly with respect to the supervision of Weinberg. They point out that during the more than one year of Abscam's operation, Weinberg was accompanied by agents Amoroso or McCarthy only half the time, and that the rest of the time he was free of government supervision.

There are several flaws in this argument as a ground for attacking the convictions. In the first place, none of the defendants has shown any direct or specific harm resulting from the alleged lack of supervision. Defendants' claims in this regard are amorphous and unfocused. Perhaps they can best be viewed as generalizations or characterizations to be applied to the other specific instances of misconduct charged to Weinberg discussed below.

Second, defendants cite no authority holding that the constitution requires the FBI to impose a particular degree of supervision on an informant.

The third flaw in the argument is that even though a lack of supervision may connote a defect in an investigation, the only relevant question is whether ultimately that defect affected the reliability of the result, and, as shown in the discussion of reliability, Section VI–A–6, *supra*, on this point the government rates well.

The fourth defect in this argument is factual, for the supervision imposed on Weinberg was more than adequate to the circumstances of this investigation. Weinberg recorded literally hundreds of conversations and telephone calls outside of the agents' presence. While Weinberg was given some discretion as to what calls to record, this court is satisfied that he exercised that discretion by recording all calls and conversations that he could consistently with safety and convenience. There is no evidence presented by any of the defendants that a particular phone call or conversation exonerated him or that the lack of a particular recording in any way prejudiced him.

Undoubtedly, there were many unrecorded phone calls and conversations in which Weinberg participated over the many months of the investigation, but the evidence shows no pattern or purpose to them that would warrant an inference of misconduct or evil intent. Nor does the constitution demand that the FBI or an informant record every conversation with a subject. Preserving evidence in electronic form may add credence to the government's case, but failure to record raises no constitutional defect; it does no more than possibly reduce the persuasive quality of the government's case in the eyes of the jury.

Moreover, and contrary to defendants' assertions, Weinberg was supervised extensively by the FBI. In an investigation that spanned many months and meetings all along the east coast, Weinberg was in virtually daily contact with Amoroso, and his recordings were delivered to the FBI for

---

**19.** Indeed, when considering the accuracy and details of what happened when the crime was committed one might fairly compare the shadows in Plato's cave with the usual trial based on mere oral testimony, and the reality outside the cave with the videotaped evidence in this case. *See* Plato, *The Republic*, Book VII, 546 (Viking Press, Inc. 1948) (S. Buchanan ed.).

transcribing on a periodic basis. Most importantly, the key events on which the government relied in presenting its cases, the appearances before the videotape cameras, took place in the presence of the FBI agents, and occasionally under the direct supervision of an attorney from the Eastern District Strike Force. Beyond that, supervising agent Good and strike force chief Puccio continually monitored the progress of the investigation, and each reported regularly to their respective superiors in the bureau and the Department of Justice.

Finally, the ultimate "safeguard" in these cases was that the central part of the criminal conduct charged to each congressional defendant was recorded on videotape so that the jury could directly interpret, assess and evaluate its every nuance, its full flavor, its pervasive aura of corruption.

2. *Missing Tapes.*

■ All defendants argue in one way or another that entire tapes or parts of tapes are "missing". This argument is directed not to any videotapes, but only to audiotapes, most of which were recorded by Weinberg. In some instances, entire conversations were not recorded; Weinberg explained that he sometimes had conversations over the telephone when his recorder was not available, and that at other times he did not have blank tapes available. On occasion Weinberg recorded over a previously recorded conversation that he regarded as unimportant. There is no evidence that the recordings thereby erased were anything but what Weinberg judged them —unimportant. Once when he was flying to New York from Florida, a number of tapes, less than 10, were stolen from his flight bag, an incident he promptly reported to Amoroso. With some conversations the recorded portion does not begin until after the conversation had obviously begun; with others, the recorded portion ceases before the conversation ends.

All of these claims add up to an assertion that not every conversation during Abscam between Weinberg and various subjects was preserved in a recording. As already discussed,[20] however, this is not a constitutional defect. While it offered to defendants an argument to the jury as to the credibility of the government's case, the argument did not prove to be persuasive.

The *Myers* defendants argue, in addition, that the "missing" tapes require an inference that they contained exculpatory material. However, they explain neither what effect the inference should have nor in what way the unrecorded conversations could exculpate any of the defendants. Nor did they request such a charge to the jury.[21]

Perhaps defendants seek a "per se" rule that whenever a law enforcement agent fails to record a conversation the defendant automatically must be acquitted on the presumption that the unrecorded material would have totally exonerated him from guilt. Such an argument must be rejected out of hand as frivolous. Trials are a search for truth and fairness, not a game to be run by automatic, unrealistic rules. Absent even a hint of what benefit to defendants the information on the "missing" tapes would offer, the effect of any "missing" tapes ceased to be relevant upon the return of the juries' verdicts.

3. *Verbal Insulation.*

■ The *Myers* defendants argue that when a potential target in an undercover investigation merely states that he desires to act within the law, the government should be automatically foreclosed from any further investigation of him. Presumably, the basis for this argument is the law's concern that an innocent person not be unlawfully entrapped into criminal conduct.

Defendants' argument goes too far, however. If adopted, it would provide a corrupt politician easy insurance against any undercover investigation, for when the sug-

---

**20.** *See* section VI–B–1 *supra.*

**21.** Of course, "missing" tapes would *permit* inferences favorable to a defendant, and de-

fendants argued this point to the juries. They do not, as the *Myers* defendants now argue, *require* such inferences.

gestion of improper conduct was raised, all the subject would have to do would be to invoke the magic incantation. "I desire to act within the law" and then plunge into his nefarious activities, confident that thereafter any statements or conduct by him would be immune from investigation. Such a *per se* rule would soon frustrate virtually all undercover law enforcement.

As presently viewed by the Supreme Court the law protects the innocent in an undercover investigation, not by honoring incantations of "verbal insulation", but by making available the defense of subjective entrapment to be determined by a jury, always with power reserved to the court to set aside any conviction obtained by "outrageous" government conduct that disregards principles of fundamental fairness. It is not "outrageous" merely because the agents did not cease their efforts immediately upon a politician's initial proclamation of honesty.

4. *Violations of Laws, Regulations and Guidelines.*

■ Defendants argue that dismissal of the indictments is required because in the course of Abscam the government engaged in widespread and continuous violations of laws, regulations and guidelines. Significantly, they do not point to violations of the constitution, nor do they relate any of the claimed violations to any particular constitutional rights of these defendants. Instead, their arguments are aimed at the operation of Abscam in general.

■ It is clear, however, that for a court to dismiss an indictment there must be not only a constitutional violation, but also some resulting adverse effect or prejudice to the defendant. *U.S. v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981). In Justice White's opinion, rare in the Supreme Court because it was unanimous, he noted

absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment [for a sixth amendment right to counsel violation] is plainly inappropriate, even though the violation may have been deliberate. This has been the result

reached where a Fifth Amendment violation has occurred, and we have not suggested that searches and seizures contrary to the Fourth Amendment warrant dismissal of the indictment. 101 S.Ct. at 669 (footnotes omitted).

In support of the reference to the fifth amendment, Justice White cited *U.S. v. Blue*, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966), where the Court had commented that so drastic a step as barring prosecution altogether for having acquired incriminating evidence in violation of the fifth amendment

might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book. 384 U.S. at 255, 86 S.Ct. at 1419.

Again, in *U.S. v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), a majority of the Supreme Court concluded that due process comes into play only when the governmental activity in question violates some protected right of the particular defendant. Violation of a third party's right does not warrant court intervention on due process grounds.

The Second Circuit in *U.S. v. DeSapio*, 435 F.2d 272 (CA2 1970), *cert. denied*, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971), reached a similar conclusion when it commented:

The difficulty courts have had in explicating and marking the boundaries of the defense of entrapment, * * * suggests the inadvisability of attempting to develop a penumbral doctrine that would add to the many collateral issues now pervading criminal trials still another, a judicial determination whether the activities of an informer had passed some ill-defined acceptable bounds. Where, as here, there is no claim that the informer's activity infringed any specific of the Bill of Rights or any statute of the United States relating to the conduct of investigations, and the competing considerations are such that we are unable to conclude

that it violates the "decencies of civilized conduct", * * * such decisions had best be left to the executive branch, which is accountable for its conduct to congress. 435 F.2d at 281 (citations omitted).

In *U.S. v. Szycher*, 585 F.2d 443 (CA10 1978), the Tenth Circuit also recognized a possible due process defense based upon outrageous conduct by law enforcement people. The informant there had used and distributed cocaine to others, had fraudulently solicited credit, had converted and stolen property, had failed to pay his just debts, had a past criminal record, and had been paid $300 a head by the government agents for each person he could bring into the drug trade. These factors, separately or together, were insufficient to warrant dismissal of the indictment, however, because they did not infringe any right of the defendant. To present a valid defense, the court held, the misconduct "must be postured as connected in some way to the commission of the acts for which the defendant stands convicted". 585 F.2d at 447.

Even with formal administrative regulations, violation does not require so mild a sanction as suppression of evidence, *U.S. v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); much less could violation of regulations or guidelines require dismissal of an indictment.

Defendants point to certain "guidelines" for the conduct of undercover investigations that had been established by Attorney General Levi and that were referred to by Assistant Attorney General Heymann in his testimony before a congressional committee looking into Abscam after it went public. While many of those guidelines may have been aimed at producing "reliable" evidence, none of them alone expresses a constitutional standard.

From the justice department's point of view, an indictment should not be brought without an excellent chance for a conviction; weak cases, therefore, are to be avoided. Most of the guidelines have the dual purposes of injecting basic fairness into the proceedings and of assuring a convincing case when the investigation is concluded.

Failure of an investigator to follow any particular guideline or any combination of guidelines, however, does not authorize a court to invalidate a conviction. Mere weak spots in the government's case are properly the subject of evidence and argument before the jury, as they were in these cases, and they may increase the chances of acquittal. But they neither guarantee nor warrant dismissal by the court.

Defendants also point to the failure by FBI agents to make the usual "302 reports" of some of the events which occurred in the course of the Abscam investigation. Amoroso made few, if any. His explanation was that he was working undercover and that the truly significant events in which he participated were fully recorded on tape, video and audio. For him, completing 302 reports that summarized conversations already fully recorded electronically would have been useless paperwork. While 302s are desirable, perhaps indispensable for the FBI to effectively function in its overall operations, their absence does not raise constitutional issues in these cases. Lack of documentation of the government's investigation raises issues of credibility, but not of constitutionality.

5. *"Red Flags".*

Defendants argue that the justice department recklessly disregarded certain "red flags" which should have put them on notice that the investigators were "out of control". The focus here is upon a series of claimed instances of Weinberg's misconduct, coupled with certain warnings and questions that were raised about the investigation by Robert Del Tufo, United States Attorney for New Jersey, and two members of his staff, Robert Weir, and Edward Plaza.

First, as to the claimed misconduct by Weinberg, none of the instances, even if true, has any direct relationship to any protected right of these defendants. Except for the three expensive watches that Weinberg promptly turned over to the FBI, there is inconclusive evidence in the record about the gifts. The court is satisfied that DiLorenzo, Errichetti's nephew, lied about

the microwave oven. The other evidence of gifts is simply unpersuasive.

It is true that Weinberg encouraged Errichetti and Rosenberg to provide forged certificates of deposit, supposedly to be used by the sheik as security for release of cash from his overseas banks. This technique, however, simply furthered the overall investigation and was carried on under the supervision of and with the knowledge of the FBI. By convincing Errichetti and Rosenberg that Weinberg, Amoroso and the sheik were willing to act illegally, Weinberg carried forward the theme of the overall scam, and made his other overtures to them appear more credible. No social harm came from this conduct; the phony CDs were turned over to the FBI and were never used.

Similar considerations control Weinberg's receipt from Errichetti of a letter forged over the signature of Senator Williams. Weinberg and Amoroso had told Errichetti that the new Arab businessmen who were considering buying the titanium mine would like confirmation in writing that Senator Williams would guarantee government contracts for purchase of the titanium after the sale, just as he had agreed to do for the original investors before the sale. Errichetti volunteered to supply such a document, indicating his willingness and ability to have it forged. There was no impropriety in Amoroso and Weinberg permitting Errichetti to go ahead when the only result was to have the forged document delivered to them. Indeed, the document constitutes powerful evidence of the depths of corruption to which Errichetti, an elected public official, has sunk.

Much attention at the due process hearings was focused upon the so-called "coaching incident" involving Weinberg, Errichetti and Senator Williams on June 28, 1979. Just before Williams was to meet the sheik, Weinberg and Errichetti spoke to him about the impending meeting and how they thought Williams should speak and act. Prior recorded conversations among co-conspirators Errichetti, George Katz, Alex Feinberg and Sandy Williams had revealed that Senator Williams was close-mouthed, reluctant to push his own position, and frankly unimpressive to the likes of Errichetti. Weinberg, of course, desired to have Williams appear before the sheik (and the hidden TV camera) without inhibition or restraint so that he would clearly reveal his position, made clear by him and his co-conspirators, that he would guarantee titanium contracts. In Weinberg's conversation with Williams, which Weinberg recorded, he urged Senator Williams to impress upon the sheik how important and influential the senator was, that he should "come on strong", that what he said was not important because Williams was "on stage for 20 minutes". Weinberg told Williams "You gotta just play and blow your horn. The louder you blow and mention names, who you control * * *." Williams Ex. 14.

Defendants argue that this kind of "coaching" of subjects in advance of their appearances before the hidden cameras is grossly improper and typical of the overall conduct of Abscam. It is neither. While not to be condoned, because it creates a serious danger of unreliability, such conduct by Weinberg could be the basis for corrective judicial action only if it appeared that it actually had some effect upon Williams' own behavior. When he testified at his own trial, however, Williams stated that he paid no attention to what Weinberg had told him, and that when he appeared before the sheik he knew what he was going to say and he said it. Williams Tr. 4284–86. Moreover, Williams was not a weak, naive, inexperienced person. On the contrary his intelligence, strength and insight had carried him to the very heights of political prominence and power.

Nor was the "coaching" incident typical of Abscam. Except when on camera, at the meetings, Weinberg did not speak to any other of the congressional defendants at any time, let alone at the critical point just before the meetings. Thus, none of the present defendants can claim to have been directly affected by the Williams "coaching" incident, nor was there any pattern of

similar operations that in some way might be said to have affected the rights of these defendants.[22]

Considerable evidence was presented at the due process hearing about a meeting at the home of special agent Larry Schneider in New Jersey, held on August 9, 1979. The meeting was attended by Weinberg, Good, several FBI agents from New Jersey, and Plaza and Weir from Del Tufo's office.

According to Plaza and Weir, Weinberg was criticized at that meeting for having given Senator Williams instructions prior to the June 28th meeting. This testimony was corroborated to some extent by two of the New Jersey FBI agents. Weinberg's alleged response was that if he did not put words into the subjects' mouths the government would never be able to make cases.

By the time of the due process hearing Plaza and Weir, and, of course, the defendants, urged that this incident with Williams constituted serious misconduct that jeopardized the entire investigation. Plaza and Weir testified that a serious argument developed between Plaza and Weinberg at the August 9 meeting, and that "putting words in subjects' mouths" became a major point of concern for the rest of the investigation.

There is no question but that some sparks were generated at the August 9th meeting. Plaza's abrasive manner and blunt criticism caused Weinberg to argue with him and later even to threaten to quit Abscam if Plaza and the New Jersey prosecutors were going to run it. Even before the August 9th meeting Lawrence Scharf of the Eastern District strike force had cautioned Weinberg that he should not put words into the subjects' mouths. Weinberg and Good disliked and distrusted Plaza and his participation in the investigation. Whatever may have been said at the August 9th meeting, over the ensuing months Plaza and Weir wrote several memoranda criticizing Abscam and its handling by Puccio's staff in

the Eastern District of New York, but the "coaching" incident received only passing reference. To the extent that Plaza and Weir urge that it was a continuing and active point of dispute, therefore, they are inaccurate. By the time of the August 9th meeting it was past history, and the technique was not thereafter repeated. The motivations for the conduct and testimony by Plaza and Weir and their superior, Robert Del Tufo, are discussed in section VIII, *infra.*

6. *Use of Middlemen.*

■ The congressional defendants uniformly complain of the government's use of middlemen such as Criden, Errichetti and Silvestri. They characterize them as having been "deputized" so that the government could evade its own responsibilities. Under this argument, defendants urge that after it became apparent that Weinberg could not "coach" the subjects before they appeared on camera, the government then had Weinberg "coach" Criden, Errichetti and Silvestri so that the middlemen in turn could tell the congressional subjects what they were supposed to say and do when they met with the sheik's representatives. In effect, defendants argue, the middlemen themselves were made representatives of the government, which now must answer for their misconduct.

To suggest that the government be held responsible for the criminal, corrupt, self-seeking machinations of Errichetti and Criden is ludicrous. Those men, as well as Silvestri, smelled easy money to be made by bringing in corrupt politicians who would promise the sheik special favors in return for money. The government, of course, realized how venal and corrupt Errichetti and Criden were. From the agents' point of view, the surprising thing was that any public official would do business with such people and, worse yet, permit himself to be brought into strange surroundings to dis-

---

**22.** There was some controversy over an incident involving a New Jersey state official that occurred some three months before the Williams incident. The recording, however, is difficult to decipher and provides little useful evidence. Even if Weinberg then spoke as he later did to Williams, there is no evidence that he did so with any of these defendants, who took their bribes five and seven months later.

cuss private legislation with strangers representing foreign businessmen, and, worst of all, to accept money under those circumstances.

The government's "use" of Criden, Errichetti and Silvestri was no more improper than an undercover agent's infiltration of a drug ring in order to gain the confidence of its members and obtain evidence necessary for conviction. *U.S. v. Russell*, 411 U.S. at 432, 93 S.Ct. at 1643. Like drug trafficking, trafficking in corrupt political influence is extremely difficult to detect. In a bribery transaction, as with a drug sale, both participants are satisfied with the result. There is no "victim"; each side receives what it requested. The ultimate victims of drug sales are the users who become addicted and enslaved to an extra-legal system that forces upon many of them a life of crime, misery and death. While less dramatic, the consequences of bribery are more insidious. No one suffers immediate pain; indeed, with a successful bribe, only the participants know it occurred. The overall consequences to society, however, are very dangerous.

As Judge Newman noted on a pretrial appeal in the *Myers* case,

> [B]ribery is a secretive enterprise, not likely to be detected as long as the bribe giver and taker maintain their silence. A sting operation, it is urged, provides a needed law enforcement weapon. Finally, emphasis is placed on the high public interest in guarding against corruption in the legislative process. The known availability of a bribery sting can act as a powerful deterrent. *U.S. v. Myers*, 635 F.2d 932, 939 (CA2 1980).

When public officials are as readily corrupted as were the defendants in these cases, the republic is in grave danger. Far more threatening to our national survival than any foreign enemy is corruption and rot at the center of our government. If legislative action by members of congress can be purchased with funds supplied by unseen foreigners, in jeopardy is the very core of our democratic government, faithful representation of citizens by their elected representatives.

Detection of bribery is difficult, if not impossible, unless either the one who offers or the one who receives the bribe cooperates with law enforcement. Because most bribes occur in secret, usually in a "one-on-one" situation, proof of such meetings by electronic recording is essential. In order to detect and successfully prosecute crimes of the type committed here, law enforcement officers must have considerable latitude to infiltrate the activity, to pose as persons willing to pay money for favors, to encourage others to produce corrupt politicians who will accept bribes, to present a misleading appearance by use, for example, of the "sheik" scenario, complete with yacht, airplane, private hotel suites and other trappings of wealth, and to secretly record the resulting bribe transactions. Middlemen are a necessary part of the overall investigative effort, for a corrupt politician would be most unlikely to respond directly to a stranger's bribe overtures. More likely, he would prefer to work through a "bag man" or at least through someone in whom he has confidence, generated perhaps by past personal experience in similar matters.

In these Abscam cases, the government presented no independent evidence of any prior arrangements between these middlemen and the defendant congressmen. The government did have, however, confident assurances by the middlemen that they had the contacts and that they could and would produce congressmen ready to take bribes. With these defendants, those assurances must have been based on something more than mere hope, be it actual knowledge, past experience, or whatever. But on whatever the middlemen relied, it obviously combined with ready corruptibility on the part of the defendants.

The agents had no duty to independently verify the middlemen's claims of access to corrupt congressmen; simply waiting to see what happened was verification sufficient to provide reliability. In some cases the middlemen's claims proved unfounded; in others, however, as with these defendants, the claims sadly proved to be accurate.

Unlike the other congressional defendants, Thompson did not accept his money on the first offer. After he left the meeting, Criden argued extensively with Amoroso, claiming that there had been an earlier understanding between Criden and Weinberg that the payment could be made to Criden for later delivery to Thompson. When Amoroso made it clear that the payment would have to be made either directly to Thompson or to Criden in Thompson's presence, Criden asked for a second opportunity to bring Thompson to them. That same evening he returned with Thompson who, then, readily accepted the money.

Although Thompson tries to make much of these differences, his rights were in no way infringed by these events. Placing these recorded meetings together, Thompson's understanding of what was happening and his willingness to accept the bribe money were crystal clear to the jury and to this court.

Citing the interim meeting on October 9, 1979 wherein Criden, Weinberg and Amoroso discussed Thompson's refusal of the money in his first appearance before the cameras, Thompson argues that the government in many ways improperly authorized Criden to misrepresent to Thompson what was going on. Such an interpretation of the interim meeting is misleading. A more accurate view is that Criden was disappointed by Amoroso's failure to give up the money to Criden and Thompson, even though Thompson had not committed himself to assist the sheik on immigration.

In effect, what Amoroso and Weinberg did was to give Criden a second chance to demonstrate Thompson's corruption. Perhaps he had not sufficiently prepared Thompson for the meeting; perhaps Thompson had temporarily lost his nerve. In any event, Criden said he was confident that proper assurances could be made and that delivery of the money could be made in Thompson's presence based on those assurances. An overall evaluation of the two Thompson meetings, linked by the interim meeting between Criden, Amoroso and Weinberg, was uniquely a problem for the jury, and raises no constitutional issue.

Moreover, in the actual context of the trial, the events of October 9th were not the conduct for which Thompson was charged or convicted. They, together with the testimony by Congressman John Murtha, merely provided background to show that Thompson had aided and abetted Murphy in Murphy's receipt of a $50,000 payoff at a subsequent meeting.

Ultimately, Thompson's arguments come down to a contention that the evidence against him lacked reliability and was insufficient to prove beyond a reasonable doubt that he was aware that he was engaging in bribe activities on October 9, 1979. However, reliability is provided by the videotaped episodes, and by the testimony of Congressman Murtha. What interpretation should be placed upon that testimony and upon what was said and done in front of the video cameras was a function for the jury. There was no way for the government to prove what Criden said to Thompson over the telephone or in Thompson's office. Thompson, himself, testified to those conversations, but evidently the jury did not believe him. If these events failed to measure up to the justice department's recommended guidelines, that might help the justice department determine whether or not a strong case was "made", but it does not render Thompson's conviction unconstitutional.

7. *Book-writing.*

 Defendants contend that their constitutional rights have been violated because of alleged book-writing activities by Weinberg, Puccio and a retired FBI agent, Neil Welsh. Agent Welsh had little contact with Abscam while it was going on, has not yet written a book, is not shown to be about to, and in any event, is a retired agent over whom the government has no control and for whom it has no responsibility.

Weinberg, himself, has not written a book, but did cooperate with one Robert Greene, who published a book in April 1981

about Weinberg and Abscam.[23] Since Weinberg is not a federal employee, his conduct cannot be controlled directly. It may be, as defendants contend, that Weinberg surreptitiously obtained from FBI files copies of some of the photographs appearing in Greene's book. There is no evidence, however, that the FBI or anyone from the Department of Justice assisted him in that activity. Most important, defendants have failed to show that Weinberg's cooperation with Greene in any way infringed any right of the defendants, all of whom were tried and convicted before the book was published. In fact, the Greene book project may have actually assisted defendants, for they used information in Greene's outline for the book as a basis for cross-examining Weinberg at trial and information taken directly from the book in an attempt to bolster their arguments on these motions.

The problems presented by allegations that Puccio agreed to author or co-author a book are different. Puccio was head of the Eastern District Strike Force all during Abscam, and he was the highest "line" agent of the justice department with direct, daily supervision of Abscam. He also prosecuted all three of the cases now under consideration as well as Senator Harrison Williams and Alexander Feinberg. Clearly and uniquely, he controlled and directed Abscam.

Defendants contend that Puccio agreed with Jack Newfield, an editor of *The Village Voice*, to write a book about Abscam. If true, such an agreement would be grossly improper, if not a criminal violation under at least the conflict of interest prohibition of 18 U.S.C. § 203. Upon closer examination, however, defendants' allegations have proved to be mere wishful thinking.

Newfield and Puccio have known each other since 1976 and became close personal friends in 1978 when both became fathers. They and their families have vacationed together; they meet frequently on a social basis. In the summer of 1979, Newfield, who has written a number of books on social topics, inquired of Puccio whether he would be interested in collaborating on a book about federal law enforcement based primarily upon Puccio's experience in the Strike Force. Puccio's response was that he might be interested someday, but could not consider it as long as he remained employed by the government. Newfield persuaded Puccio to meet once with Newfield's literary agent, who, after discussing the book possibility with them, concluded that such a book would have only limited sales appeal. Nothing further was done about such a book. At that time, neither Newfield nor the literary agent knew anything about Abscam.

Newfield first learned of Abscam when it went public on February 2, 1980. Shortly after that, Newfield's agent, recognizing the sales potential of an insider's story on Abscam, asked Newfield if Puccio would collaborate on a book covering the investigation. Doubting that he would do so, Newfield nevertheless asked Puccio about it and received the expected reply, that Puccio could not even discuss the matter until the cases were closed and Puccio had left the department. Despite Puccio's unwillingness, Newfield himself signed a contract with a publisher to write a book on Abscam, and the contract made provision for the possibility of an unnamed collaborator who would receive a substantial cash advance. Puccio did not know about the collaboration clause until January, 1981. Both Puccio and Newfield testified that there was no formal or informal agreement or understanding between them with respect to the collaboration clause, and the court believes them.

Obviously, Newfield and his publisher would like to have Puccio as a collaborator on a book about Abscam, as no doubt would many other authors and publishers. It is equally obvious to this court, after hearing both Newfield's and Puccio's testimony on the subject, that Puccio never agreed to write such a book, and he has never considered doing so as long as he remains an employee of the justice department. At all

---

**23.** R. Greene, *The Sting Man* (Elsevier-Dutton Pub. Co., Inc. 1981).

times Puccio has acted with complete integrity and propriety with respect to Newfield's overtures to him about such a book. Nothing in these circumstances in any way taints the integrity of Abscam, its resulting prosecutions, or Puccio's handling of them.

8. *The "Asylum Scenario".*

There was some conflict in testimony in the various trials as to precisely how, when, where, and by whom the so-called "asylum scenario" was created. It may have been suggested by Weinberg in the spring of 1979. It may simply have occurred to Amoroso when he read of General Somoza's problems in remaining in this country, problems †that were extensively covered by the news media just one day before Criden and Errichetti arrived on the yacht in Florida to discuss casino financing. While the differences in testimony might be proper considerations for the jury in determining the credibility of Weinberg and Amoroso, the ultimate facts surrounding origination of the asylum scenario are immaterial to this case. Whether it came from Weinberg, or Amoroso, or someone else, makes no difference to any issue before the court, nor to any issue before the jury except credibility. The undisputed facts are that it was discussed on the yacht with Errichetti, who, on the plane ride back to Philadelphia discussed it with Criden, and that shortly thereafter Criden and Errichetti together began producing politicians who accepted the bribes offered to them.

C. *Weinberg and His Conduct.*

Defendants focus a number of attacks on Melvin Weinberg, whose peculiar talents undoubtedly contributed much to the success of Abscam. Some of these arguments are dealt with in earlier sections of this decision, *e.g.*, VI–A–3, VI–B–1, VI–B–2, VI–B–5, VI–B–6 and VI–B–7, *supra*. This part of the decision considers some of the remaining arguments against the government's use of Weinberg in this investigation.

1. *Weinberg's Criminal Background.*

██ Defendants argue that the government knew that Weinberg was untrust-worthy and that defendants' due process rights were violated when the government permitted such a person to play a major role in Abscam. For Abscam to have been successful, however, the investigation required a man of Weinberg's unusual persuasive talents. He was an experienced con man, who in the past had successfully played the role of front man for wealthy Arabs, and who had numerous contacts in the gray world of those who associate with organized crime figures, influence peddlers, crooked businessmen and corrupt politicians. Clearly, Weinberg does not have the "pure" background one might reasonably expect in an FBI special agent. But it was precisely because of his unsavory background, his ability to lie convincingly, his understanding of the corrupt mind and his ability to imagine and execute a grand charade on the scale of Abscam that Weinberg was enlisted for the investigation. Further, Weinberg gave considerable credibility to the entire undercover operation; persons dealing with Weinberg in the context of Abscam could check him out with other sources and be wrongly assured that they were not dealing with government agents. Weinberg had a track record that no legitimate government agent could provide or falsify.

Moreover, the government was not required to find Weinberg "reliable", as would be the case if he were an informant whose information was used to obtain a search warrant. As indicated elsewhere in this decision, section VI–A–6, *supra*, the basic reliability for the investigation, and ultimately for the prosecutions, was guaranteed by having the crimes committed on camera under circumstances guided by Agent Amoroso and closely supervised by Agent Good.

Defendant Murphy would analogize Weinberg's prior "front fee scam technique" to his claimed solicitations of gifts and loans from subjects of the investigation. But even assuming that Weinberg in Abscam solicited gifts and loans, they were incidental to the scam and not the heart of the transaction. The focal point of the

criminal transaction here was the substantial financial benefit of $50,000 delivered to the congressmen. While anything of value Weinberg received from defendants beyond the knowledge of the FBI may subject Weinberg to difficulties in his relationship with the FBI, that fact would not in any way alter or detract from the acts of the defendants. Throughout these trials, defense counsel sought to make Weinberg's character and activities the key issue before the juries, thus distracting from the conduct and motivations of the defendants. These issues were unsuccessful "red herrings" at the trials, and they are "red herrings" still.

The court finds no constitutional infirmity in the government's use of a person of Weinberg's background as a central figure in this undercover operation.

2. *Weinberg's Finances.*

 Defendants also urge that their due process rights have been infringed because of (a) the amount of money paid to Weinberg during the investigation and prosecutions, (b) a possible promise to Weinberg of a bonus at the end, and (c) the government's failure to require Weinberg to pay income taxes.

There is no question but that Weinberg has been substantially compensated for his Abscam services. The total payments to him at the time of the *Williams* trial amounted to approximately $150,000. From approximately April 1979 to April 1981 he was paid by the FBI at the rate of $3,000 per month, plus expenses, plus certain bonuses in recognition of work perceived by the Bureau to be exceptional. In addition, Weinberg testified that he expected to receive a substantial additional payment when Abscam is concluded. He hopes it will be on the order of $100,000. Both Weinberg and the FBI agents deny that any bonus has been guaranteed to him or that any additional payments are conditional upon the ultimate success of the prosecutions.

Here the court finds that Weinberg's payments in Abscam have not been contingent. Even if they were, however, that would be but one more fact to be weighed in determining the reliability of the results obtained. Payments to informants contingent upon successful prosecution of those with whom they deal have been judicially criticized, but such payments do not require dismissal of an indictment. *See, e.g., U.S. v. Brown*, 602 F.2d 1073 (CA2 1979); *U.S. v. Szycher*, 585 F.2d 443 (CA10 1978).

By cooperating with the government in establishing and operating Abscam, Weinberg has essentially devoted nearly three years of his life to this investigation. His personal safety is in serious jeopardy, and there is little that he can do in the future by way of either legitimate or illegitimate activity. His "career" as a con man has ended because he is so well known. Legitimate businessmen undoubtedly would shun him, because of his confessed criminal history and obvious talent for subterfuge, trickery and lying.

Whether his contribution to law enforcement in these cases and the personal sacrifices he has endured, during both the investigation and the prosecutions, are worth the amount of money the government has conferred upon him, is perhaps a matter for serious consideration by the justice department and even by congress. It is not, however, a matter upon which this court will pass judgment for purposes of determining whether the fruits of his activities on behalf of the government should be dismissed. How much money is paid to a government informant is peculiarly a decision for the executive department, and not one for judicial review at the behest of a defendant who was caught by the informant's activities.

The issues are similar with respect to Weinberg's income tax liabilities. All citizens, of course, must meet their obligations under the internal revenue laws. When a citizen fails to do so, he or she may be subject to administrative or judicial penalties for failure to meet those obligations. As with the previously discussed possibility that Weinberg extracted gifts from defendants without knowledge of the FBI, Weinberg's failure to pay taxes may subject him

to difficulties in his relationship with the IRS or the FBI. What is clear, however, is that these defendants have suffered no infringement of their rights because the government, for whatever reason, has not yet prosecuted Weinberg for possible income tax violations.

### D. Miscellaneous Claims.

#### 1. FBI Interview of Lederer.

■ Defendant Lederer claims he was trapped into giving a false statement to an FBI agent who interviewed him on February 2, 1980. He claims that the agent knew the true facts, but asked questions of Lederer which permitted him to give false answers. According to Lederer, this was an effort to "test his morality" and his failure of the test had the effect of prohibiting him from testifying at trial. In effect, Lederer argues that the government has no right to ask him any question to which it already knows the true answer.

Merely to state the argument is to refute it. If such questioning by an agent violated a defendant's due process rights, much legitimate governmental investigation would be stymied. Defendants do not need such unprecedented protection, since truth is a solid protection for the innocent. When a person is questioned by an FBI agent, he or she may answer truthfully, without fear, if no crime has been committed. If a person has such fear, protection is limited to the silence guaranteed by the fifth amendment's privilege against self-incrimination. No defendant has a constitutional right to lie to the investigating agent, and then have a successful prosecution set aside because the agent knew at the time of the interview that the defendant's statements were lies.

#### 2. Instructing Agents about Testimony.

Defendant Lederer claims that the government instructed its agents to "pepper" their testimony throughout the trial and due process hearings with the answers, "I don't know" and "I don't recall". To begin with, there is no evidence whatsoever that any of the agents or Weinberg was given such instructions. Of course, many of the questions did produce such responses. In this court's view, however, when the agents testified that they did not recall an incident, their lack of recollection did not appear to be unreasonable or deliberate.

The questioning of the agents was intensive, focusing frequently on many irrelevant details, and covering many circumstances that an agent might reasonably forget. The investigation had covered many months and included hundreds of meetings and conversations with a large number of people. It used electronically recorded conversations as the primary means for recordkeeping, thereby greatly relieving agents of the need for careful recall of many events. Moreover, particularly with Weinberg and Amoroso, the undercover operatives were dealing with a number of fictitious stories that varied from subject to subject. Keeping them straight at the time must have been severely taxing. To fully recall them all several months later, in proper sequence and with the minute detail demanded by defense counsel, would have been impossible. The court detected no signs of evasiveness on the part of the agents or Weinberg. When they answered "I don't know" or "I don't recall" the court was satisfied that they were truly reflecting their actual recollections at the time.

#### 3. Entrapment of Lederer.

■ Defendant Lederer, the only one to request an entrapment charge to the jury, argues entrapment as a matter of law. To the extent that his argument focuses upon "objective entrapment", it has been covered above in section VI–A–1, supra. However, since entrapment was also a jury issue for Lederer, his argument of "entrapment as a matter of law" can also be viewed as an assertion that on the evidence before the jury no reasonable juror could find beyond a reasonable doubt that Lederer was predisposed to commit the crime.

Lederer argues that the government's proper role was limited to detection of persons who were already involved in criminality, that Lederer's crime and the intent to commit it originated with the government

agents, not defendant Lederer, and that "absent the temptation offered by the government agents, Lederer might not have committed the crime." Lederer's memorandum at 7. The essence of this claim is that the government's evidence, which established no more than criminal conduct on this one occasion, was legally insufficient to meet the government's burden of proving that Lederer was "predisposed".

■ The flaw in Lederer's argument, however, is demonstrated by the careful exposition by Judge Learned Hand of the three means available to the government to show predisposition of a defendant where that defendant claims that governmental officials had designed and provoked the particular crime:

> an existing course of similar criminal conduct; the accused's already formed design to commit the crime or similar crimes; *his willingness to do so, as evinced by ready complaisance. U.S. v. Becker,* 62 F.2d 1007, 1008 (CA2 1933) (emphasis supplied).

It is not unfair to permit a jury to infer a defendant's mental state, his predisposition, from the manner in which he responds to a bribe offer. With Lederer, who confirmed on videotape that he was "no Boy Scout", his willingness, eagerness and predisposition were easily and reasonably inferred from the videotape of the bribe transaction, evidence that was more than sufficient to support the jury's verdict. Under such circumstances, Lederer's claim of entrapment as a matter of law must fail.

4. *Publicity Leaks.*

■ In pretrial motions all defendants argued that the indictments should be dismissed because of prejudicial publicity given to Abscam before return of the indictments. There can be no doubt but that leaks from the Department of Justice did occur. Judge Mishler denied defendants' pretrial motions to dismiss on this basis, finding that defendants "failed to demonstrate that they suffered actual prejudice by reason of the pre-indictment publicity." Memorandum and order of August 6, 1980

at 15. Judge Mishler also found that dismissal of the indictments would be an unwarranted exercise of the court's supervisory powers.

These leaks caused serious embarrassment to the government and such concern to the justice department that it designated Richard Blumenthal, United States Attorney for the District of Connecticut, to investigate and report. At least part of his findings have been made public, and appropriate internal discipline has been administered to the offenders by the justice department.

This court need be concerned with the causes of the leaks only if some right of a defendant was infringed. There is no indication here that either fair treatment before the grand jury or a fundamentally fair trial was in any way compromised by the barrage of publicity that accompanied public revelations of defendants' activities and the Abscam investigation. Before the grand jury, the cases of all of these defendants were extremely simple, consisting primarily of the videotapes. There is no indication that any of the grand jurors was influenced in favor of returning indictments by earlier publicity, and Judge Mishler disposed of this aspect of defendants' claims in his memorandum and order. Of course, the indictments returned have ultimately proved to be well-founded, because in each case extensive trials, vigorously and meticulously defended by able counsel, have established not only probable cause for prosecution, but guilt beyond a reasonable doubt.

As to the trials themselves, the court is satisfied that each juror selected was free of any prejudice or bias that may have resulted from the leaks of information out of the justice department, other pretrial publicity, or the information made public in preceding trials. Careful questioning of each potential juror eliminated those who showed prejudice from prior publicity and succeeded in selecting for each trial fairminded jurors who were able to view the

evidence impartially and reach a fair determination.[24]

## VII. JUDGE FULLAM'S DECISION IN U.S. v. JANNOTTI AND SCHWARTZ

Since Judge Fullam in Pennsylvania has dismissed the indictments against Philadelphia councilmen Jannotti and Schwartz on post-conviction motions similar to those now before this court, some discussion of his decision is appropriate. *U. S. v. Jannotti*, 501 F.Supp. 1182 (ED Pa.1980) (appeal pending). Familiarity with Judge Fullam's opinion is assumed.

In reaching his conclusion, Judge Fullam was obviously influenced strongly by the tenuous connection between the Philadelphia trial events and federal jurisdiction, and he expressly disapproved "artificial federalization of purely state crimes". 501 F.Supp. at 1204.[25] The Philadelphia "bribes" involved local officials and their relationship to local zoning matters in the city of Philadelphia. Schwartz and Jannotti made no commitment that they would be influenced in their decisions. Indeed, they were so anxious to have the sheik construct his hotel complex in the city that the mere offer to make such an investment would have guaranteed any reasonable variances required. Defendants had not requested the bribe payments and they made it clear that such payments were unnecessary. Under these circumstances, Judge Fullam

found that the Hobbs Act, 18 U.S.C. § 1951(a), which provided one of the pegs for federal jurisdiction, did not apply because there was no extortion within the meaning of the statute. Moreover, according to Judge Fullam, the Hobbs Act does not operate "to confer federal jurisdiction over purely hypothetical potential impacts on commerce which could never occur." 501 F.Supp. at 1185.

With the Abscam cases now before this court, the Hobbs Act is not in issue. Instead, the congressmen were charged with and convicted of violating other federal statutes such as bribery, conflict of interest, and criminal gratuity. Such direct violations of federal law by federal officials establish unquestioned federal jurisdiction.

Judge Fullam did find a basis for federal jurisdiction under the alleged RICO violations, 18 U.S.C. § 1962(c), premised upon the activities of Criden's law firm as the "enterprise". Since Judge Fullam found the RICO convictions to be supported by sufficient evidence, he found it necessary to consider the entrapment and due process issues, both of which he resolved against the government.

Many of the factors that were central to Judge Fullam's due process decision in Philadelphia, however, are either different or absent from the New York cases. With Jannotti and Schwartz, for example, the

24. Leaks of information about pending prosecutions is a matter of grave concern to this court as it is to all those interested in the integrity of our judicial processes. Particularly objectionable here was the public bragging of one nationally syndicated columnist that his assistants had been able to view tapes and transcripts that a federal judge had ordered sealed. Had they caused prejudice in any of these cases, such knowing violations of an order of the United States District Court would surely have precipitated criminal contempt charges. However, since the columnist in question was read by very few of the jurors, and had obviously influenced none of them, the time and effort required by such an investigation and possible prosecutions would not be justified. Government employees should be aware, however, that to receive something of value from that columnist or from any member of the news media in return for making available to them documents, tapes or testimony

sealed by court order, might very well make them guilty not only of contempt but also of violating some of the same sections of the criminal code—bribery, criminal gratuity and conflict of interest—that proved the undoing of the Abscam defendants themselves.

25. Judge Fullam also seemed to be considerably influenced by what he assumed to be the adverse consequences of the "coaching" incident involving Senator Williams. *See* section VI–B–1, *supra*. His information about that incident was limited, however, to what others had said about it, for he did not then have the benefit of Senator Williams' own testimony. One wonders whether the incident would have carried as much impact in his due process calculus had Judge Fullam then been enlightened by Senator Williams' testimony that he was not influenced by Weinberg's "coaching".

undercover agents indicated that the sheik would not consider investing in the city unless the councilmen accepted the money that was offered. No parallel threats were made with the congressmen. On the contrary, with each of them, money was clearly offered in relation to official conduct in immigration matters. If the official agreed to be "influenced" in that matter, it was bribery under federal law; if the payment was received merely in relation to the matter, it was a criminal gratuity or conflict of interest, or both.

Further, the extensive emphasis in Philadelphia on the "Arab mind", 501 F.Supp. at 1194, was not nearly as significant in the dealings with the congressmen. Only in the January 25, 1980 meeting with Myers was there any significant reference to the "Arab way" or the "Arab mind", and this was months after Myers had taken his bribe.

Moreover, unlike the case involving the Philadelphia councilmen, the Congressmen here were presented with a clear request that their official conduct be influenced in a manner that would otherwise not occur.

Judge Fullam found the inducement to the councilmen to be so attractive that the government could not use their acceptance of the money as evidence of predisposition. The large sums, the fact that the councilmen were not asked to act improperly but only to do what they would have done anyway, and the threat that if they did not take the money there would be no project, all combined in Judge Fullam's view to preclude the mere acceptance of the money as sufficient evidence of predisposition. With each of the congressmen charged in these indictments, the circumstances were far different. While the amounts offered were comparatively large, they were to be shared in substantial part by the co-conspirators. In each case the congressman was asked to act improperly and in clear violation of federal law, and in no instance was there any indication that other conduct by the sheik would have been influenced by whether or not the money for immigration legislation was accepted or refused. On the contrary, the congressmen wanted the sheik to invest in their districts so as to provide a "cover" for support of his immigration to this country.

Since he was sitting in the Third Circuit, Judge Fullam was, of course, governed on the due process issue by *U.S. v. Twigg*, 588 F.2d 373 (CA3 1978), one of the few cases on record where a conviction has been set aside because of the government's excessive creative involvement in a crime. Although he recognized that "governmental subterfuge and even creative involvement may be necessary to combat" municipal bribery, Judge Fullam concluded that the techniques employed with the Philadelphia councilmen, Schwartz and Jannotti, "went far beyond the necessities of legitimate law enforcement" and, under *Twigg*, ordered that judgments of acquittal be entered on their behalf. 501 F.Supp. at 1204.

Although Judge Fullam accepted the propriety of undercover agents using a business entity, real or imaginary, as an attractive target for corrupt overtures by city officials even with hints that such overtures would be welcome, he concluded that "it is neither necessary nor appropriate to the task of ferreting out crime for the undercover agents to initiate bribe offers, provide extremely generous financial inducements, and add further incentives virtually amounting to an appeal to civic duty." 501 F.Supp. at 1204. He also thought it permissible for undercover agents to initiate bribe proposals "at least in connection with suspected ongoing corrupt activities on the part of the targeted officials." *Id.*

As previously indicated, this court is not directly controlled by *Twigg*. To the extent that Judge Fullam found due process violations in the undercover agents offering bribe proposals in the absence of "suspected ongoing corrupt activities on the part of the targeted officials" this court respectfully disagrees. *U. S. v. Ordner, supra*, 554 F.2d 24 (CA2 1977).

If the "appeal to civic duty" directed at Schwartz and Jannotti was essential to Judge Fullam's conclusion, then his decision is clearly distinguishable on the facts. Here, potential investments in the defend-

ant congressmen's districts were essentially discussed as a means of protecting the congressmen and providing them an explanation for their proposed introduction of private legislation. Investments here were an inducement to accept a bribe primarily in the sense that a congressman's introduction of a private immigration bill for the sheik in return for bribe money could be justified to others by the sheik's financial participation in the congressman's district. The appeal here was not to defendants' civic duty, but to their greed, backed by an assurance that the sheik would do what he could to protect the congressmen from exposure.

■ If Judge Fullam's opinion should properly be read to be grounded on outrageous governmental conduct because the undercover agents initiated bribe offers and provided extremely generous financial inducements, then this court again disagrees. The government needs such techniques in its effort to resist corruption on the federal level, especially where, as here, the issues are uncomplicated by the artificial jurisdiction problems that beset Judge Fullam's case. This need, coupled with the extremely difficult task of uncovering bribery, removes from the category of "outrageous" governmental conduct the activities of the undercover agents in the present cases.

Judge Fullam's premise that providing "extremely generous financial inducements" offends due process is, respectfully, unsound. The subjective entrapment approach, the only entrapment approach acceptable to the Supreme Court, *see* section V–A, focuses upon the predisposition of a particular defendant, so what constitutes a "generous financial inducement" necessarily varies with the circumstances of each person being induced. If the courts were to establish a threshold amount beyond which no public official could be convicted of bribery, the rich and the powerful, those most likely to be in a position to demand large bribes, would automatically have the benefit of this defense and the crime of bribery as we know it would become the poor public official's burden. There can be no *per se* amount at which a bribe offer becomes so

generous as to constitute entrapment as a matter of law. Under the subjective entrapment approach, of course, the jury may consider all these factors on the question of predisposition, but a *per se* rule with respect to the size of monetary inducement is illogical, unworkable, and unfair.

Judge Fullam recognized that in evaluating "outrageous" conduct a court must consider the nature of the crime involved and the tools available to combat it. *See Twigg*, 588 F.2d at 378 n.6. The restrictions he would place on governmental investigations of bribes, however, reflect a different evaluation than that of this court as outlined in section VI–A–6 of this decision. In this court's view, investigation into corrupt public officials warrants at least as strenuous and imaginative undercover efforts as do investigations into drug traffickers. The harm, tangible and intangible, inflicted on this country by corrupt public officials demands judicial support for law enforcement techniques that deter corrupt conduct through fear of vigorous prosecution.

In sum, the *Jannotti and Schwartz* case in the Eastern District of Philadelphia presented serious problems of federal jurisdiction not present with the congressional bribes which were the subject of the cases in the Eastern District of New York; the circumstances under which the money was paid to the Philadelphia councilmen were far different from the cash transfers to the congressmen here; and the authority of the Third Circuit's decision in *Twigg*, while binding in Philadelphia, lacks any parallel in this circuit. Finally, this court cannot accept the suggestions by Judge Fullam that large bribes offend due process while small ones do not, and that bribery and public corruption may not be enthusiastically attacked by undercover techniques such as used by law enforcement officers in other contexts.

## VIII. DEL TUFO, PLAZA AND WEIR

In its early days, Abscam was drawn away from its investigations into stolen art and certificates of deposit toward the gam-

bling casinos of Atlantic City, and finally, due primarily to Errichetti's activities, to the corrupt officials in New Jersey and Philadelphia.

Robert Del Tufo was United States Attorney for New Jersey. Two of his assistants, Edward Plaza and Robert Weir, were assigned to work with Abscam once its intensifying focus on New Jersey became apparent. Abscam, however, was the creature of the Hauppauge, Long Island office of the FBI and was being run aggressively, but carefully, by Puccio and his Eastern District Strike Force. Weir and Plaza at least, and perhaps Del Tufo as well, were jealous of the obvious importance and success of the investigation. They were also embarrassed because an investigation which began outside of their district had uncovered a cesspool of corruption swirling around Angelo Errichetti who was mayor of one of the largest cities in southern New Jersey, as well as a member of the New Jersey state senate, and who openly claimed access to the strings of power in the White House, in the New Jersey state house, in New Jersey's casino control commission, in labor unions, and in organized crime. For such a man to be unmasked by an out-of-district-prosecutor was a severe "slap in the face" to those in New Jersey charged with investigating and prosecuting violations of law.

Once it became apparent that the New Jersey U. S. Attorney's office would play a minor role in these major investigations, Plaza and Weir took a negative view of everything about Abscam. They acted as if they had convinced themselves that the highest duties of a prosecutor were to manufacture arguments for defendants, to follow an ultra-cautious approach, and to be skeptical of all new investigative techniques. Throughout their Abscam participation they urged the justice department to move more cautiously and slowly. Indeed, they did not want to move at all until every possible flaw in the investigation could be meticulously checked.

Of course, the government must not infringe the constitutional rights of any of its citizens, and New Jersey's abstract, cautious approach to law enforcement activities has great appeal in some circles of government, of law, and of academia. But such hesitation and caution is unrealistic in the practical hurly-burly of a fast-moving investigation that would not wait for lengthy reflection, but instead demanded immediate decisions, aggressive attention, and imaginative, courageous responses to rapid developments.

Under our adversary system constitutional questions can ultimately be tested in the quiet reflection of a courtroom under established procedures and the rigors of cross-examination. While a prosecutor must always be alert to and protective of defendants' rights, his or her primary function is to investigate and bring to trial those whose conduct transgresses the law. If all federal prosecutors were as hesitant to proceed in the uncharted Abscam waters as was the New Jersey office, federal law enforcement in this country would be about as effective as was New Jersey's with the New Jersey Abscam people—i.e., there would be few, if any, indictments.

There is no perfect case. Claimed due process violations have rarely required dismissal either of indictments or of convictions that were obtained on sound and convincing evidence. The usual consequence of a due process violation has been an adjustment in what evidence can be presented at trial, reflected in the redaction of documents or testimony, or sometimes in the total suppression of illegally acquired evidence.

Plaza's attitude toward Abscam was perhaps best expressed when just before Abscam went public he told a member of the Eastern District Strike Force, "I hope the whole thing blows up in your face". D.P. Tr. at 2892–93. Plaza did not cooperate; in fact, he resisted, and at the end almost obstructed the investigation. He may well have believed that he was sincere in his concern for defendants' rights. Had the opportunity to prosecute been his, however, one wonders if he, too, might not have put more faith in the adversary system and left

it to defense counsel to raise some of the due process questions that he and Weir so diligently pursued in an apparent attempt to divert Abscam's momentum from Senator Williams.

When Plaza appeared in court on the due process hearing, he turned over to defense counsel a complete file of confidential government memoranda that he had collected from the New Jersey office, and he did this even though he had been specifically instructed by a superior in the justice department not to do so absent a specific direction by the court. At the time, he gave no warning to the court of the confidential nature of the documents he was producing. It was only through prompt and candid warning from one of defense counsel that the court was alerted to the implications of Plaza's precipitous action.

Plaza and Weir also took it upon themselves to complain to their superiors in Washington, with copies to all of the judges assigned to the various Abscam cases, that the government prosecutors were wilfully withholding *Brady* material from defense counsel. Although all of the information referred to necessarily required careful examination through the due process hearing, none of it revealed any violations by the Eastern District of New York prosecutor under either *Brady* or the Jencks Act. 18 U.S.C. § 3500.

## IX. MOTIONS FOR JUDGMENTS OF ACQUITTAL AND NEW TRIALS

All defendants have moved on multiple grounds for judgments of acquittal or alternatively for new trials. Additional briefs on these motions were submitted by the *Myers* defendants and by Murphy and by Thompson. Lederer has relied upon the material included in his principal brief on the "due process" issues.

### A. *The Myers Motions.*

In support of their motions, the *Myers* defendants urge all of the grounds that they advanced in connection with the due process issues and in addition, argue (1) that the court erred on various instructions

to the jury, particularly with respect to the credibility of witnesses; (2) that defendant Errichetti's trial should have been severed from that of the other defendants; (3) that the evidence was insufficient with respect to Criden and Johanson; (4) that the prosecutor's summation was improper; (5) that the court's jury selection procedure was improper; (6) that venue of the case in Brooklyn had been improperly "manufactured" by the government; (7) that there were certain violations of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), particularly with respect to the government's failure to disclose information bearing upon the credibility of Weinberg as a witness; and (8) that there was error in permitting the jury to see the videotape of Myers in January, 1980 as evidence of his state of mind in August, 1979.

The court has carefully considered all of the arguments advanced by the *Myers* defendants and concludes that none of them alone, nor all of them together, constitute sufficient basis for either a judgment of acquittal or a new trial with respect to any of the four defendants. A few comments about some of these contentions are appropriate.

The complaints about the prosecutor's closing argument ring hollow in the context of this case. Given Myers' surprising defense, that he was "play acting", the defense dramatically placed into contrast Myers' demeanor in his appearances with the undercover agents before the TV cameras and his appearance on the witness stand before the jury. Under these circumstances the prosecutor's comments about "incredible" and "Alice in Wonderland" constituted no more than fair comment and argument about the evidence. The prosecutor's argument was fair, even restrained when contrasted with the summations of defense counsel. Nothing in the prosecutor's summation could fairly be interpreted to have implied that he had additional information about the case beyond what was presented in the courtroom. Indeed, his plea to the jury was to decide the case precisely on the basis of comparing what

they had seen on the videotape with what they had seen of Myers on the witness stand.

This court did not see a need for individual voir dire of the jurors in the *Myers* case, although it did appear to be called for in the *Thompson* and *Lederer* trials. When the *Myers* defendants came to trial in August, 1980, much of the publicity about Abscam that had occurred in February and March had been forgotten. In the initial inquiry to the full panel of jurors, substantially less than 50% of the jurors could even recall Abscam or anything about it. By way of contrast, after the heavy publicity given to the *Myers* trial, a much larger proportion of the jurors recognized the name "Abscam" and had some familiarity with it by the time of the *Thompson* and *Lederer* trials. Even in those later cases, however, the questioning of the jurors themselves revealed, at most, only passing recognition of Abscam. The multiple voir dire technique used with *Myers* has not been shown, nor even claimed to have caused, any prejudice to any of the *Myers* defendants, all of whom were virtually unknown in the New York-Long Island area prior to February, 1980.

The *Myers* defendants urge *Brady* violations from the government's failure to supply them with a variety of bits of information claimed to bear on Weinberg's credibility. While it is true that there were some events about Weinberg's past conduct and his activities during the Abscam investigation that might be viewed as bearing upon his credibility, defendants have not shown that Weinberg's credibility as a witness at trial had any significant bearing on the case.

Counsel for the *Myers* defendants, and those in the *Thompson* and *Lederer* trials as well, tried to focus upon Weinberg as the "villain in the piece", following the well-known defense tactic of attempting to get the jury to "try" anyone in the courtroom except the defendant himself. When viewed objectively, however, Weinberg's testimony was used by the government only as a framework for background information and upon which to hang the audiotape recordings that were admitted in evidence. There was no significant issue at trial over the general background and outline of the Abscam investigation, and while there was an attempt to challenge the authenticity of one or two of the recorded telephone conversations, those conversations by themselves played no significant role in the focal point of the trial: the scene on the videotape when Myers took the $50,000.

Moreover, even if there were some significance to Weinberg's credibility at the trial, there was so much material not only available to defendants, but also used by them, to challenge his credibility that the additional items which might have been brought out would at best have been cumulative. Weinberg admitted that he had been a criminal most of his life, that he made his living by being a con man, that he had lied and cheated and violated the law from his early teenage years, that he was a convicted felon, that he had made a deal with the government to cooperate in return for probation on his felony conviction in Pittsburgh, and that he had received substantial compensation for his cooperation in the Abscam investigation and trials. If Weinberg's credibility had been a significant part of the case, undoubtedly all defendants would have been acquitted. As the trials developed, however, the government offered Weinberg's testimony only to lay a foundation for the introduction of audiotape recordings. Since the basic pattern of events was not in dispute, even the audiotapes only provided a background for the important evidence in the case: the videotapes with respect to Myers and Errichetti, and the testimony of Ellis Cook and other non-government witnesses to tie in Criden and Johanson.

The *Myers* motions are therefore denied.

### B. *Murphy's Motions.*

Defendant Murphy also incorporates all of his arguments in the due process memoranda as well as all of the arguments advanced by defendant Thompson. In addition, defendant Murphy argues (1) that on

this record as a matter of law he cannot be found guilty of both receiving a criminal gratuity and conflict of interest; (2) that he cannot be found guilty on the conflict of interest count because Thompson was acquitted on that count; (3) that the court's supplemental instruction on receipt of the money was erroneous; (4) that the court's treatment of co-conspirator hearsay statements under *U. S. v. Geaney*, 417 F.2d 1116 (CA2 1969), was improper because it was more harsh on defendants than in the *Myers* case; (5) that the government suppressed certain evidence concerning Criden's possession of a briefcase on January 8, 1980; (6) that there were *Brady* violations with respect to Weinberg's testimony at the *Myers* trial and other incidents relating to Myers; (7) that there were *Brady* violations concerning Congressman Murtha's testimony about whether or not he expected to be prosecuted; and (8) that the government improperly concealed information about co-defendant Criden's "plea deal".

The court has carefully reviewed all of the arguments advanced by defendant Murphy and concludes that no one of them taken alone, nor all of them taken together, warrant either a new trial or a judgment of acquittal.

 Only a few comments about Murphy's arguments are necessary. The legal theories surrounding conflict of interest and receipt of a criminal gratuity were explored at length at the trial on the record. Simply put, they are separate crimes for which Congress has established separate penalties. Defendant's argument that he cannot lawfully be convicted for both an unlawful gratuity and conflict of interest is unsupported by either legislative history or case law.

Murphy's contention that the jury's verdicts on the conflict of interest count are inconsistent because Thompson was acquitted while Murphy was convicted, is equally unconvincing. The jury was instructed to consider separately the evidence relating to each defendant on each count. The fact that the jury returned a mixed verdict merely indicates that they endeavored to follow the court's instructions. Moreover, even if the verdicts are viewed as inconsistent, that would not be a basis for setting aside the conviction. *Standefer v. U. S.*, 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980).

With respect to the court's stiffening of its position with respect to co-conspirator hearsay statements, even defendant Murphy does not claim that the charge given to the jury was erroneous. Instead, he claims that his trial tactics would have been different had the court alerted him at the beginning of the trial that the problem would be handled differently from what had happened at the *Myers* trial. The claim of actual reliance is as unconvincing as is the claim of a right to rely on discussions about the charge that took place at the beginning and during the trial.

Murphy's discussion of the 302 report that placed the Murphy payoff briefcase in Criden's hands on January 8, 1980, greatly overstresses the significance of the briefcase itself in the Murphy payoff that occurred on October 20, 1979. The jury's attention was directed to the $50,000 contained in the briefcase. It was clear that Criden left the room with the briefcase in his hands. It is equally clear that all participants' interest was in the $50,000, not in who ended up with the briefcase after the money had been removed.

With respect to Congressman Murtha the newspaper report referred to by Murphy, and Nathan's subsequent testimony indicate only a unilateral decision by the justice department; they do not indicate any communication of that decision to Murtha, and the only relevant issue was Murtha's knowledge and understanding as to whether or not he would be prosecuted. He testified that he had made no deal with the government and did not know whether or not he would be prosecuted; there is nothing to indicate that he had any different knowledge.

With respect to Criden's "plea deal", the "deal" has nothing to do with a "plea". As the record clearly shows, the agreement

was simply that if Criden's conviction in the *Myers* case was affirmed, the government would dismiss the indictment against him in the *Thompson* case. No guilty plea was contemplated. The understanding was arrived at only as a matter of timing of the trial, should one become necessary. Defendant Murphy could not have been adversely affected by that agreement, whether it was reached before or after conclusion of the *Thompson* trial.

With respect to the court's supplemental instruction in response to two notes from the jury, the matters were extensively discussed on the record before the instructions were given. Thompson Tr. 3235–3283. There the court's analysis is set forth; nothing in defendants' present arguments changes that view.

Murphy's motions are therefore denied.

## C. *Thompson's Motions.*

Thompson, too, incorporates all of his due process arguments as a basis for judgment of acquittal or a new trial. In addition, he advances arguments under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1973), focused upon Weinberg's credibility. He also challenges the sufficiency of the indictment and the proof that together focus upon the concept of Thompson's receiving money in return for Murphy's being influenced. He makes a further argument with respect to claimed inconsistent verdicts.

The court has carefully reviewed all of these contentions and finds them an inadequate basis for the relief sought, either taken separately or together. The insignificance of Weinberg's credibility was discussed above in connection with the *Myers* claims. The sufficiency of the indictment was reviewed in a pretrial motion and the court's reasoning in that discussion remains unchanged by the trial events.

The claim of inconsistent verdicts fails for two reasons. One, inconsistent verdicts in a criminal case do not require reversal. *Standefer v. U. S.*, 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980).

Two, the verdicts are not inconsistent, but easily reconciled on this record in light of the relative participations of Thompson and Murphy in the events. Thompson argues that there is no conceivable way in which the jury could have found Thompson involved in duping Murphy. If that were so, then Murphy's experienced counsel wasted much time and his client's money in even trying this case, because his only defense to the jury was that he was not aware that there was money in the briefcase. Other evidence in the case demonstrated Thompson's awareness of the actual situation presented by the sheik's representatives to the congressmen. Under all the evidence, therefore, the jury could reasonably and rationally have found that Criden and Thompson were aware that money was to be passed at the meeting but that Murphy was not. The jury obviously did not ultimately interpret the facts that way because they also found Murphy guilty, but at least they did, or reasonably could have, interpreted Murphy's culpability as being differently based than that of Thompson.

Thompson also complains about the court's supplementary instruction to the jury in response to their notes during deliberations. As indicated under the Murphy motions above, these arguments were carefully reviewed on the record at trial and need not be rehashed here.

Defendant Thompson's motions are therefore denied.

## X. CONCLUSION

In these three cases the congressional defendants were caught on videotape *in flagrante delicto*,[26] accepting money in relation

---

**26.** Latin: "in the very act of committing the offense. [lit., in blazing crime, *i.e.*, in the heat of the evil deed]" The Random House Dictionary of the English Language, The Unabridged Edition. (1971).

to their official conduct as public servants. By overwhelming evidence the other defendants were proven guilty of aiding and abetting the *Myers* bribery. None of the defendants was a "deprived" citizen. All of them occupied honored, well-rewarded, and highly respected positions in our society. Four of them sat in the highest legislative body of the country. Another, a former state prosecutor, was a respected lawyer in a well-known law firm, serving in an ancient and honorable profession. Still another combined a legal career in the same firm with a political career in Philadelphia's local government. The seventh occupied a dual position of public trust as mayor of a large city and state senator of New Jersey. Despite their respected and trusted positions, defendants' crass conduct here reveals only greed, dishonesty and corruption. Their major defense has been that they were tricked into committing the crime on videotape.

The government's need to unmask such conduct more than justifies the investigative techniques employed in these cases. Without question these convictions were reliable, and no constitutional right of any defendant has been infringed. While the government's conduct of the investigation was not flawless, the overall work of the FBI, of the Eastern District Strike Force and of their superiors in the Department of Justice reflects a moderate, fair, careful approach to an undercover investigation which suddenly and unexpectedly proved effective in uncovering corruption in Congress.

The investigators on Long Island and their supervisors in Brooklyn kept extensive records and provided reasonable information to their superiors in Washington. Contrary to defendants' claims, this was not a runaway investigation. True, it moved fast, impelled by greedy middlemen and cooperative corrupt public officials who appeared so frequently they made life hectic for the investigators. In large measure, the undercover agents and the FBI were able to keep straight the various deals with the corrupt officials. Their record-keeping fell behind at times, but always the evidence of the crucial meetings was accurately and permanently secured in the videotape cassettes.

In addition to the particular points discussed in this decision, the court has considered all the other arguments raised in the pre-hearing, mid-hearing, and post-hearing submissions of counsel and has found them lacking in merit. After careful consideration of the many problems raised about Abscam over the course of these cases, which have now covered approximately one year, this court is satisfied that all of the defendants were proved guilty beyond a reasonable doubt, that the trials accorded to them were fair, that the arguments advanced for setting aside the convictions and dismissing the indictments on "due process" grounds are without merit, and that there are no circumstances requiring a new trial for any of the defendants.

Accordingly, all of defendants' motions directed to the verdicts and to the indictments are denied. Defendants Myers, Criden, Errichetti, Johanson, Thompson, Murphy and Lederer are directed to appear before this court in the ceremonial courtroom of the United States Courthouse, 225 Cadman Plaza East, Brooklyn, New York, for sentencing on August 13, 1981, at 10:00 a. m.

SO ORDERED.